# EXHIBIT 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


-----------------------------------

                                    :

MOHAMMED NABI and RIFAT RIZVI,       Case No.

on behalf of themselves, FLSA     :  14 CIV 4635(VEC)

Collective Plaintiffs and

the Class,                          :

                    Plaintiffs, :

        -against-                   :

HUDSON GROUP (HG) RETAIL, LLC,    :

AIRPORT MANAGEMENT SERVICES,

LLC and JOHN DOES 1-10,           :

                    Defendants.  :

-----------------------------------


                *    *    *

          DEPOSITION OF MOHAMMAD NABI

                *    *    *



            TRANSCRIPT of testimony as taken by

and before MONIQUE VOUTHOURIS, a Certified Court

Reporter, RPR, CRR and Notary Public of the States

of New Jersey and New York, at the offices of

DLA PIPER, 1251 Avenue of the Americas, New York,

New York, on Tuesday, October 7, 2014,

commencing at 12:08 p.m.

1      Q.    Now, sir, I understand you stopped
2  working at Hudson in May of 2013.  Is that correct?
3      A.    Which year?
4      Q.    May of 2013.
5      A.    Yeah.
6      Q.    Where did you go to work after Hudson?
7           MR. LEE:  I'm sorry, you know, I don't
8  usually object a lot, but I'm going to instruct him
9  not to answer.  I just don't think employment after
10  the fact is relative or discoverable just because
11  I've had problems with people after they leave the
12  job, their current job, and people start writing or
13  talking to their existing boss about how they are
14  being sued in another lawsuit.  So if you want to
15  raise it with a court, I'm happy to do it.
16           MR. KERNEN:  Well, we will if we have
17  to, but I think Phil has already assured you that we
18  have no intention of trying to interfere with his
19  current employment, but I think there is some
20  relevance to it.
21  BY MR. KERNEN:
22      Q.    Let me ask you, how many different jobs
23  have you held since leaving Hudson?
24      A.    No, only one.
25      Q.    Only one?

**[Page 82]**

1      A.    Yeah.
2      Q.    And you still currently have that job?
3      A.    Last month only two, three weeks I don't
4  have a job.  I work in museum gallery, sometimes they
5  change, no job.  Last week I worked 20 hour, this is
6  not really a job, you know, I don't got the job also.
7  That's security work.  Fifth Avenue Modern Art
8  Gallery, last two months, 20 hours, two, three weeks
9  no hour, nothing.
10      Q.    Is that the only place you've worked
11  since leaving Hudson?
12      A.    Yeah, only this, Clark Security Company.
13      Q.    What was that again?
14      A.    Clark Security Company.
15      Q.    Did you send in a written application or
16  resumé to get the job?
17      A.    I send different company, but no
18  response, different company, no job.
19      Q.    Right.  But did you send to Clark
20  Security a written application or resumé?
21      A.    I just fill out to go to their office, I
22  say I am family person, I need a job.  Then boss give
23  me job, say fill out the application and they give me
24  job.
25      Q.    So you filled out a written application?

**[Page 83]**

1      A.    Yeah.
2      Q.    Did you provide a copy of a resumé?
3      A.    No.
4      Q.    And the written application was to Clark
5  Security, not to the art museum.  Is that right?
6      A.    Yeah, they have contract with art
7  museum, the same stuff, last two month very slow,
8  they change almost 30 people working, maybe one day,
9  two day working, that's very --
10      Q.    Clark Security is in New York City?
11      A.    Yes, their office is.
12      Q.    Say that again.
13      A.    Queens their office.
14      Q.    Sir, when you were working at Hudson, do
15  you recall seeing posters on the wall that addressed
16  wage or employment laws?
17      A.    Hudson News?
18      Q.    Yes, at Hudson News.
19      A.    Yeah, sometimes I see this.
20      Q.    Posters that would have statements about
21  certain laws?
22      A.    Yeah, different rule, regulation, you
23  know, suppose you leave is --
24      Q.    You said rules, regulations and then you
25  said what?

**[Page 84]**

1      A.    Vacation, sick leave.
2      Q.    Vacation, sick leave.  Correct?
3      A.    Yeah, yeah.
4      Q.    Health issues, health, cleanliness, did
5  you see that?
6      A.    I don't follow this.
7      Q.    You don't follow that?
8           How about overtime and wage issues, did
9  you see posters on that?
10      A.    No.
11      Q.    Do you recall any other kind of posters
12  that you saw in or near the break room?
13      A.    Yeah, break room, yeah, break room.
14      Q.    Yes.  What kind of posters do you
15  remember seeing in the break room?
16      A.    I don't remember, sir.
17      Q.    So there were some posters there.  You
18  just don't remember what they were?
19      A.    Yeah, some poster.
20           (Exhibit Nabi-7, Document number 1293,
21  marked for identification.)
22      Q.    Sir, please take a look at what we have
23  marked Nabi-7, two-page document.  Two separate
24  documents.  The first one, sir, has the number 1293
25  in the bottom right-hand corner and is that your name

**[Page 85]**

1  and address in the upper right-hand side?
2     **Q.**  Upper right-hand side?
3     A.  Yeah, my name, sir.
4     **Q.**  And your address?
5     A.  Yes, same.
6     **Q.**  And then down in the lower right, is
7  that your printing and your handwriting?
8     A.  Yes, my handwriting.
9     **Q.**  And did you read this before you signed
10  it?
11     MR. LEE:  You just need to answer the
12  question, did you read this document before you
13  signed it?
14     **Q.**  Yes, before you signed it did you read
15  it to make sure you understood it?
16     MR. LEE:  Before.
17     A.  Actually, before I don't read it.  I
18  think the office, the computer print out, take the
19  sign, you know.  But we don't have copy for reading.
20  I don't read, sir.
21     MR. LEE:  You didn't get a copy?
22     THE WITNESS:  No, I don't read any copy
23  anytimes.
24  BY MR. KERNEN:
25     **Q.**  Well, do you recall from whom you

[Page 86]

1  received this document?  And we're talking about the
2  first page of the Exhibit 1293.
3     MR. LEE:  I'm sorry.  What's the
4  question?
5     **Q.**  Do you recall from whom you received
6  this?  How did you get it, if you remember?  If you
7  don't remember, that's fine.
8     A.  No, I don't remember.
9     **Q.**  If you just flip the page, there is
10  another document that looks exactly the same, it has
11  the number 1326 in the lower right-hand corner, sir,
12  if you could flip to the next page.  Is that your
13  handwriting in the lower right-hand corner of page
14  1236?
15     A.  Yes, this is my handwriting.
16     **Q.**  Your handwriting is on page 1236.
17  Correct?
18     A.  Yeah.
19     (Exhibit Nabi-8, Document
20  "Acknowledgement of Receipt of Hudson Group Retail
21  Employee Manual," marked for identification.)
22     **Q.**  Sir, please take a look at what we've
23  marked Nabi-8.
24     A.  Which one?  This one?
25     **Q.**  Correct.  It's a one-page document

[Page 87]

1  number 386 in the lower right-hand corner.  It's
2  entitled "Acknowledgement of Receipt of Hudson Group
3  Retail Employee Manual."  Is this your handwriting --
4     A.  This is my handwriting.
5     MR. LEE:  I'm sorry.  Can you speak more
6  clearly?
7     A.  My handwriting this one.
8     MR. LEE:  Okay.
9     **Q.**  Is all of the handwriting on this
10  document yours?
11     A.  Yeah.
12     **Q.**  Okay.  You can put that aside.
13     (Exhibit Nabi-9, Document page 413,
14  marked for identification.)
15     **Q.**  Sir, please take a look at what we have
16  marked Nabi-9.  It's a one-page document, page 413.
17  Is the printing and handwriting on this document
18  yours?
19     A.  Yeah.
20     (Exhibit Nabi-10, Copy of Retail
21  Employee Manual, marked for identification.)
22     **Q.**  And, sir, if you take a look at number
23  10, it's a document stamped page 1 through 34, a copy
24  of the retail employee manual.  Do you recall
25  receiving a copy of this, Mr. Nabi?

[Page 88]

1     A.  I don't remember, sir, I got this.
2     **Q.**  Do you recall receiving a copy of an
3  employee manual while you were employed by Hudson?
4     A.  Yeah, I got it.
5     **Q.**  You did get one?
6     A.  Yeah, yeah.
7     (Exhibit Nabi-11, Employee Handbook,
8  marked for identification.)
9     **Q.**  And then, sir, take a look at what we've
10  marked number 11, it's an employee handbook and I
11  want to ask you to flip through that and tell me if
12  you recall receiving a copy of this employee handbook
13  while at Hudson?
14     A.  Yes, we got this.
15     **Q.**  And you either read it or you had an
16  opportunity to read it.  Correct?  Is that "yes"?
17     A.  Yes, sir.
18     **Q.**  Did you either read this or at least
19  have an opportunity to read it?
20     A.  Yeah, yeah.
21     **Q.**  You read it.  Is that "yes"?
22     A.  Yes.
23     **Q.**  Now, the shaking of the head, she can't
24  take that down.  She needs to take it down, and try
25  to speak up a little bit louder, please, sir.

[Page 89]

**[23]  (Pages 86 to 89)**

1 someone called out sick so that payroll would get
2 their payment numbers right?
3     A.   Yeah, sometime boss follow this who in
4 the stores.
5     Q.   Who follows?
6     A.   General manager, yeah, he --
7     Q.   So the general manager would rely on the
8 accuracy of your recording?
9     A.   Yeah, yeah, the record is, yes, he
10 follow this.
11     Q.   Right.
12     A.   That's why we write accurate all day in
13 the store.
14     Q.   You need to accurately record who is
15 there and when and who leaves early so that the
16 general manager or other people can make sure they
17 are paid correctly?
18     A.   Yes.
19     Q.   Next item you state, "Credit card
20 machine not working.  Admin also no," is that what
21 that says?  "Credit card machine no working."  What's
22 the next line say?
23     A.   General manager know this, the machine
24 no working, tomorrow morning asked why sale drop,
25 supposed credit card 2,000 dollar sale, but then why

[Page 118]

1     Q.   What is that?
2     A.   This was some delivery supposed coming,
3 but no delivery coming, glass stand, people, boss,
4 give permission that glass stand coming in the store,
5 but no coming in the store.
6     Q.   And are you recording this primarily so
7 that the next manager coming in can see and
8 understand?
9     A.   The morning manager coming, he see this
10 one.  After that this book also going to office.
11     Q.   So in some sense you're passing
12 information to the next manager so that he or she
13 knows what's going on?
14     A.   Yes, sir.
15     Q.   And knows what to do to take care of
16 things?
17     A.   Yes, sir.
18         MR. LEE:  Can we take a quick break?
19 Unless if you're almost finishing up this line of
20 questioning.
21     Q.   Let's turn to July 3 and keep going in
22 the page, look at the July 3 date, it's 1189 is the
23 page number, but if you look at just July 3 --
24     A.   Okay.
25     Q.   -- left side of the page, that's your

[Page 120]

1 sale drop.  Machine no working, how sale.
2     Q.   So it's important to record that down so
3 that people understand the explanation?
4     A.   Yeah.
5     Q.   Did you take any steps to get the credit
6 card machine fixed?
7     A.   Sometime we call there --
8     Q.   Are you responsible to call?
9     A.   Yeah.
10     Q.   Do you call the repair person?
11     A.   The repair person we call, but sometime
12 come in sometimes no repairs.  You know, the boss
13 also call, boss, boss speaks, the credit card
14 machine.
15     Q.   But sometimes it's your responsibility
16 and you would handle trying to call.  Correct?
17     A.   Yes, yes.
18     Q.   The next item number 7, "Nobody bring
19 the eyeglass stand," look at number 7, did I read
20 that right?
21     A.   Number 7.
22         MR. WANG:  June 30th.
23     Q.   Same day.
24         MR. LEE:  "Nobody bring the" --
25     A.   "Eyeglass stand."

[Page 119]

1 handwriting at the bottom.  Correct?
2     A.   Yes, sir.
3     Q.   And 1 through 10, that's all your
4 handwriting?
5     A.   Yes, sir.
6     Q.   And here you note that number 8, three
7 people go home early that day.  Correct?
8     A.   Yes, sir.
9     Q.   Did they need your permission to go home
10 early?
11     A.   No, sir.
12     Q.   Do they tell you before they leave or
13 they just leave?
14     A.   Yeah, they are sick, they are feeling
15 sick, they don't work.
16     Q.   Right.  But they don't just walk away;
17 they go to you first?
18     A.   Yeah, yeah, but we call the boss and --
19     Q.   Are you saying every time someone asks
20 to go home early, you always called the boss --
21     A.   Yes, sir.  Yes, sir.
22     Q.   Sir, wait until I finish.
23         Is it your testimony that every time one
24 of the employees in the store wanted to go home early
25 and came to you and asked you that --

[Page 121]

[31]  (Pages 118 to 121)

1     A.   We give --
2     Q.   -- you're doing it again.
3         MR. LEE:  Let him finish.
4     Q.   I'll start again.
5         Is it your testimony that every time
6 during the years that you were a manager for Hudson
7 that one of the employees asked you if they could go
8 home early, that you called the boss in order to get
9 the answer rather than just make that decision on
10 your own?
11     A.   Yes.
12     Q.   And then thereafter, though, if they
13 were allowed to go home, you would accurately record
14 it so that the next manager would know and also so
15 that payroll would get it right as far as their pay.
16 Correct?
17     A.   Yes.
18         MR. LEE:  Can we go off the record for
19 one second?
20         (Discussion off the record.)
21         MR. KERNEN:  Okay.  We can take a break.
22         (Recess 3:34 p.m.- 3:43 p.m.)
23         (Exhibit Nabi-17, Position summary
24 specialty brand manager, marked for identification.)
25 BY MR. KERNEN:

**[Page 122]**

1     Q.   Sir, take a look at what we've marked
2 number 17, it's a position summary for a job title
3 called specialty brand manager for Hudson.  Do you
4 know what a specialty brand manager is?
5     A.   Yes, specialty brand managers.
6     Q.   Do you know what that is?
7     A.   Just right now I see it.
8     Q.   Did you ever perform the duties of a
9 specialty brand manager for Hudson?
10     A.   No, sir.
11         (Exhibit Nabi-18, Position description
12 for cafe manager, marked for identification.)
13     Q.   Now, sir, here is something, a position
14 description called cafe manager for Hudson, and you
15 can look through there and see what that person's
16 responsibility is.
17         Did you ever perform the job or job
18 functions of a cafe manager for Hudson?
19     A.   No, sir.  Some person have it opening
20 the store in Penn Station, I think.
21     Q.   Penn Station, but you never worked --
22     A.   I don't work, sir.
23     Q.   Sir, you never worked in Penn Station.
24 Correct?
25     A.   No, no, sir.

**[Page 123]**

1     Q.   Am I correct you never did?
2     A.   Yes.
3     Q.   And you never worked the cafe manager
4 position?
5     A.   No, sir.
6     Q.   Is that correct?
7     A.   That's correct.
8         MR. LEE:  Just answer his question.
9         THE WITNESS:  Yeah.
10         (Exhibit Nabi-19, Position description
11 for loss prevention manager, marked for
12 identification.)
13     Q.   Sir, here is another position
14 description marked number 19, you can look at that,
15 called loss prevention manager.
16         Did you ever perform the job of loss
17 prevention manager or those duties for Hudson?
18     A.   No, sir.
19     Q.   Now, do you have any firsthand knowledge
20 about the operations over at Penn Station in those
21 stores, have you ever worked over there?
22     A.   No.
23     Q.   And do you have any knowledge, firsthand
24 knowledge of how those stores operated, what it's
25 like to be a manager there?

**[Page 124]**

1     A.   Same work, sir.
2     Q.   Excuse me?
3     A.   Same my work, yes, same like my work,
4 the Penn Station.  If I go there, I can do it, sir.
5     Q.   But you never worked there?
6     A.   No, I never worked there.
7     Q.   No one ever asked you to work at Penn
8 Station?
9     A.   Yes, sir.
10     Q.   Is that correct?
11     A.   Yes, sir.
12     Q.   And you never worked as a manager of any
13 type at any airport for Hudson around the country?
14     A.   Only I work in Grand Central and
15 continue working in Grand Central.
16     Q.   Grand Central?
17     A.   Yes.
18     Q.   No other Hudson location around the
19 country?
20     A.   Yes.
21     Q.   Is that correct?
22     A.   Yes, sir.
23         (Exhibit Nabi-20, Position description
24 for merchandising manager, marked for
25 identification.)

**[Page 125]**

**[32]  (Pages 122 to 125)**

1      Q.   Sir, take a look at Nabi-20, it's a
2  position called merchandising manager.  You can take
3  a look at those responsibilities.
4          Did you ever perform the job function or
5  job responsibilities of merchandising manager for
6  Hudson?
7      A.   No, sir.
8      Q.   You have no direct knowledge of what
9  it's like or what it means to be a merchandising
10  manager.  Is that correct?
11      A.   No, I am not merchandising manager.
12          (Exhibit Nabi-21, Position description
13  for warehouse distribution center manager, marked for
14  identification.)
15      Q.   Take a look at what we've marked 21,
16  sir, it's a warehouse distribution center manager.
17  You can see the job responsibilities there.
18          Did you ever perform the functions of
19  warehouse or distribution center manager for Hudson?
20      A.   Warehouse I don't work, sir,
21  distribution managers.
22      Q.   You never did that.  Correct?
23      A.   Yes, sir.
24      Q.   So you've never worked as a warehouse or
25  distribution center manager and you have no firsthand

[Page 126]

1  knowledge of what it means to be or what it's like to
2  be a manager of that kind.  Correct?
3      A.   Yes, sir.
4          (Exhibit Nabi-22, Position description
5  for book store supervisor and manager, marked for
6  identification.)
7      Q.   22, sir, is a position description for
8  book store supervisor and manager for Hudson and you
9  can look at the responsibilities there.
10          Am I correct that you never performed
11  the job functions of a book store manager for Hudson?
12      A.   No, I don't work, sir.
13      Q.   You never did that.  Correct?
14      A.   Never did that.
15      Q.   And you don't have any firsthand
16  knowledge of what it's like to be or what it means to
17  be a book store supervisor or manager for Hudson.
18  Correct?
19      A.   Yes, sir.
20          (Exhibit Nabi-23, Position description
21  for human resources manager, marked for
22  identification.)
23      Q.   Number 23, sir, is a position or job
24  summary for the human resources manager job --
25      A.   No, I don't --

[Page 127]

1      Q.   -- of Hudson Group, and I just want to
2  confirm for the record you never performed the job
3  functions or responsibilities of human resources
4  manager.  Correct?
5      A.   Yes, sir.
6      Q.   And you have no firsthand knowledge of
7  what it means to be or what it's like to be a human
8  resources manager for Hudson.  Correct?
9      A.   Yes, sir.
10      Q.   Okay.
11          (Exhibit Nabi-24, 2011 Logbook, marked
12  for identification.)
13      Q.   Sir, take a look at what we've marked as
14  Nabi-24.  I believe that this is the logbook you
15  worked on and wrote in for 2011, but I want you to
16  look at that and confirm for me that that is the
17  case.
18      A.   This is not my handwriting --
19      Q.   On the very first page it's not, you're
20  correct.  Your handwriting will appear on other
21  pages.  But can you just page through this document
22  and confirm, first off, that this is the book, the
23  logbook for 2011 that the managers used.
24          MR. LEE:  Can you confirm that?  Is that
25  for 2011?  This is the logbook for 2011?

[Page 128]

1      A.   Yeah, yeah.
2      Q.   And we're not going to go through it in
3  as much detail, but look at page 925, which is
4  February 13.
5          MR. LEE:  February 13?
6          MR. KERNEN:  Yes.
7      A.   Yeah.
8      Q.   Is that your handwriting, sir?
9      A.   Yes, sir.
10      Q.   So the six items above your handwriting
11  on February 13, that's all your handwriting?
12      A.   All my handwriting, sir.
13      Q.   This is the manager logbook for 2011.
14  Correct?
15      A.   Yes.
16      Q.   Sir, at the beginning of the deposition
17  you referred to another manager named Naeem.
18      A.   Naeem.
19      Q.   If you look at page 904 and 905 --
20          MR. LEE:  904?
21      Q.   904, 905, I believe I see the name Naeem
22  written, and I just want to ask you is that the same
23  Naeem that you were talking about?
24      A.   Yeah, Naeem, yeah.
25          MR. WANG:  N-a-e-e-m.

[Page 129]

1  1298 and 1299 that's your handwriting and your
2  manager approval. Correct?
3      A.   Yes, sir.
4      Q.   Correct?
5      A.   Yes, sir.
6      Q.   Sir, were the cashiers and watchmen that
7  worked under you at Hudson part of a labor union?
8      A.   They have a union, yeah.
9      Q.   Labor union. Yes?
10     A.   Yes.
11     Q.   Were there any rules that you needed to
12 be aware of and follow because of the fact that they
13 were in a labor union?
14     A.   Yeah, they follow the labor union.
15     Q.   Well, they followed the labor union
16 rules.
17     A.   Yeah.
18     Q.   But were there rules of the labor union
19 that you knew to follow because these people were in
20 a union?
21     A.   Yeah, our boss.
22     Q.   I didn't understand what you said. Yes
23 or no, did --
24     A.   No --
25     Q.   The question is: Yes or no, are you

[Page 134]

1      A.   No.
2          (Exhibit Nabi-26, Position description
3  for general manager and assistant general manager,
4  marked for identification.)
5      Q.   Sir, take a look at what we've marked
6  Exhibit 26, it's the position description or job
7  summary for the general manager and assistant general
8  manager position and you can see the job
9  responsibilities.
10          Did you ever perform these job
11 responsibilities?
12     A.   General manager --
13     Q.   Did you ever perform the general manager
14 job?
15     A.   No.
16     Q.   Or the assistant general manager job?
17     A.   General manager and another person did
18 that.
19     Q.   You never did that?
20     A.   No, I never did that.
21     Q.   And you don't know what it's like to be
22 a general manager or how general manager working
23 conditions are, correct, because you never performed
24 that job?
25     A.   No, I never did.

[Page 136]

1  aware of any rules governing --
2      A.   No, sir, I don't know.
3      Q.   The cashiers and watchmen were in a
4  labor union. Correct?
5      A.   Yes, sir.
6      Q.   Were you aware that there is something
7  called a collective bargaining agreement or a union
8  contract that governed these employees? Yes?
9      A.   No, sir.
10     Q.   You don't know?
11     A.   I don't do this.
12     Q.   Were you ever made aware of any rules
13 that you had to follow because these people were
14 union people?
15     A.   There is actually general manager follow
16 this rule regulation.
17     Q.   What was the first part of that answer?
18          MR. LEE: The general manager follows.
19     A.   General manager.
20     Q.   I'm not asking about general managers.
21 Were you ever a general manager at Hudson?
22     A.   General manager at Grand Central is
23 right now I don't know. I work --
24     Q.   I'm sorry. Let me ask you did you ever
25 have the job of general manager?

[Page 135]

1      Q.   Okay. Did anyone ever tell you any of
2  the rules from the labor union contract that govern
3  the cashiers' or the watchmen's job duties?
4      A.   No.
5      Q.   Were you ever a party to a lawsuit other
6  than the one that we have here now?
7      A.   I am not understanding.
8      Q.   You understand that a lawsuit was
9  started and your name is on it as the party suing.
10     A.   Yeah.
11     Q.   Did you ever do that before, where you
12 were suing somebody?
13     A.   No, sir.
14     Q.   Okay. Did you review any documents to
15 prepare for today's deposition?
16     A.   Yes, sir.
17     Q.   What documents did you review?
18     A.   All documents I review.
19     Q.   Did you review documents that Hudson
20 turned over in the case?
21     A.   Yes.
22     Q.   And how much time did you spend
23 reviewing those documents to prepare for the
24 deposition?
25     A.   Maybe two, three hour.

[Page 137]

[35]  (Pages 134 to 137)

1      Q.    And in terms of your performance
2  reviews, earlier there was testimony regarding your
3  performance reviews.  Do you remember that?  Do you
4  remember the performance review by Mr. Butt and
5  Mr. Soto, do you remember those?
6      A.    Yeah.
7      Q.    Did anybody ever sit down and explain to
8  you the contents of those performance reviews?  Here,
9  these, did anybody ever explain to you these
10  performance reviews?
11      A.    Not clearly.  Sometimes we go to office,
12  10 minutes, we don't got the copy here, sir.
13      Q.    Okay.  Now, there are certain -- okay.
14  So I'll give you some examples.  So I'm referencing
15  Nabi-6 --
16      MR. KERNEN:  What's the date on that?
17      MR. LEE:  That's the one that's 2012.
18      Q.    Okay.  So on Exhibit 6 --
19      MR. KERNEN:  Which page now?
20      Q.    On the first page under the heading
21  "Budget Cost Control," it says that you are
22  responsible for creating accurate and realistic
23  budgets.  Is that really part of your job
24  description?
25      A.    No, I don't do this.

[Page 154]

1      Q.    Okay.  So, and then it also says you
2  track and adjust budgets.  Is that something you do?
3      A.    No.
4      Q.    Okay.  So do your performance reviews
5  properly reflect your actual job responsibilities?
6      MR. KERNEN:  Objection.
7      A.    No.
8      MR. LEE:  Okay.  Thank you.  I'm done.
9  EXAMINATION BY MR. KERNEN:
10      Q.    You testified that you know all the
11  magazines, 1200 magazines and you know them?
12      A.    Yes, maximum I know this.
13      Q.    You know the store better than anybody
14  else?
15      A.    On magazine I do, yeah.
16      Q.    You know where they are and how they
17  should be set up better than the cashiers?
18      A.    Cashiers don't set up the magazines.
19      Q.    They don't know like you do?
20      A.    No, no.
21      Q.    So if a customer has a question or a
22  problem regarding something in the store, with your
23  experience as a manager, you know it better than the
24  cashiers?
25      A.    Yes, sir, better than the cashiers.

[Page 155]

1      Q.    You mentioned cashiers taking a break by
2  rotation.  You're aware of what the rotation is?
3      A.    Many store like this by rotation.  Other
4  one store, other store one by one, two cashiers
5  supposed and one watchman one by one, one cashier
6  supposed to be coming 4 o'clock.  He take the break
7  later.  2 o'clock cashier coming, he take the first,
8  not same time coming all cashiers.
9      Q.    But the rotation that they follow, is
10  that something in writing?
11      A.    No writing.
12      Q.    But you're aware of what it is?
13      A.    Yeah.
14      Q.    And you approve of the rotation?
15      A.    Yeah.
16      Q.    Right.  And if you did not approve of
17  the rotation, you would speak up and change it.
18  Correct?
19      A.    We don't change it, sir.  They have
20  mutual understanding, sir.  But they give the notice
21  I go to break and punch it in.
22      MR. KERNEN:  Let's mark this the next
23  one.
24      (Exhibit Nabi-27, Position description
25  for operations manager, marked for identification.)

[Page 156]

1      MR. LEE:  I thought you could only do a
2  questioning based on my additional questions.
3      MR. KERNEN:  It is, it's a follow-on.
4  You were trying to establish something with regard to
5  his responsibilities and I'm following on on that.
6      MR. LEE:  Sure.
7  BY MR. KERNEN:
8      Q.    Sir, you were asked a moment ago if your
9  job evaluations accurately reflected what your job
10  was.  Do you remember that question?  Your counsel
11  asked you about your performance evaluation by
12  Mr. Butt and Mr. Soto.
13      What I just handed you is a job summary
14  or job description for the operations manager
15  position, there is a list of job responsibilities --
16      MR. LEE:  I'm sorry, do you have an
17  extra copy just so I can have a full set?
18      Q.    If you could please look at the heading
19  "Job Responsibilities," and these are the job
20  responsibilities of the operations manager.  Do you
21  perform that first item, assist the general manager
22  in maximizing sales and profits?
23      A.    No.
24      Q.    You don't do that?
25      A.    No.

[Page 157]

[40]  (Pages 154 to 157)

1      Q.   Do you assist in recruiting employees?
2      A.   No, sir.
3      Q.   The third item, do you provide training
4 for the staff?
5      A.   No, sir.
6      Q.   Look over the rest of the items, is it
7 your testimony that you don't perform any of these
8 job responsibilities?
9      A.   No.
10     Q.   So to make sure the record is clear, am
11 I correct that your testimony is you do not perform
12 the job responsibilities for this job description?
13 Is that correct?
14     A.   Yes, sir.
15     Q.   And you've had a chance to read through
16 those responsibilities?
17     A.   Yes.
18          MR. LEE:  You're done?
19          MR. KERNEN:  Yes.
20          MR. LEE:  I just have one more add-on
21 then.
22 EXAMINATION BY MR. LEE:
23     Q.   So all the managers, where they call
24 them operations manager, even though they give them
25 these job responsibilities, their actual duties are

[Page 158]

1 different.  Is that right?
2          MR. KERNEN:  Objection.
3      A.   Yes, everybody different.
4      Q.   Because they are actually just doing
5 stocking and cashier work just like everybody else.
6 Right?
7          MR. KERNEN:  Objection.
8      A.   Same thing, regular staff and manager
9 doing the same job regular staff doing, fixing,
10 setting and manager also doing with same like job.
11         MR. LEE:  My only -- I think we're done.
12 Right?
13         MR. KERNEN:  No.
14         MR. LEE:  You have more?
15         MR. KERNEN:  Yeah.
16         MR. LEE:  Okay.
17 EXAMINATION BY MR. KERNEN:
18     Q.   Your testimony regarding what you
19 believe other operations managers do during their
20 shift is limited to those managers in Grand Central
21 Station because that's the only place you ever worked
22 and have firsthand knowledge of.  Correct?
23     A.   No, I can say like this, everybody have
24 similar knowledge, manager there.
25     Q.   Do you have any firsthand observation or

[Page 159]

1 firsthand knowledge of what operations managers in
2 locations other than Grand Central Station do?
3      A.   Same like me, yes, other locations.
4      Q.   What is the basis of your -- the
5 understanding you think you have of what operations
6 managers do at any place other than Grand Central
7 Station?
8          MR. LEE:  Why don't you just ask him how
9 does he know, isn't that easier?  Can you just ask
10 him how does he know?
11     Q.   Can you answer my question?
12     A.   I know some places like working same
13 like us.
14     Q.   Have you ever worked at Penn Station?
15     A.   No, I never worked there.
16     Q.   Have you ever worked at any Hudson News
17 location in any airport?
18     A.   No, sir.
19     Q.   Have you ever worked at any train
20 station or train depot location for Hudson News
21 anywhere in the country other than Grand Central
22 Station?
23     A.   No, other than Grand Central, no.
24     Q.   And on what do you base any belief that
25 you have about operations managers outside of Grand

[Page 160]

1 Central?
2      A.   Sometimes we have some friend, we
3 talking with them, you know, same, like same our
4 position there.
5      Q.   What friend are you talking about or
6 friends?
7      A.   Suppose some person transfer from other
8 location our place.
9          MR. LEE:  To our place.
10     A.   Our place.
11     Q.   Meaning Grand Central?
12     A.   Grand Central.
13     Q.   Can you give me the names of any of
14 those people?
15     A.   Suppose Rizvi.
16     Q.   Rizvi?
17     A.   Rizvi also transfer from Penn Station,
18 she also working same like Penn Station and Grand
19 Central.
20     Q.   Have you ever observed, gone over to
21 Penn Station to observe and watch what their
22 operations managers do?
23     A.   I don't go to Penn Station.
24         MR. KERNEN:  Okay.  That's all.
25     A.   But I know that one person working, she

[Page 161]

[41]   (Pages 158 to 161)

1    also tell me like this their job also same like us
2    and she work before Grand Central also.
3    BY MR. KERNEN:
4        **Q.**    "She" meaning Ms. Rizvi?
5        **A.**    No.  Her name is Sultana.
6        **Q.**    Can you spell that, please?
7        **A.**    S-u-l-t-a-n-a.
8        **Q.**    Sultana, now she works at Grand
9    Central and used to work --
10       **A.**    Before working --
11       **Q.**    What was that?
12       **A.**    Long time.
13              MR. LEE:  I thought she used to work at
14   Grand Central and then she went to Port Authority.
15   Right?
16              THE WITNESS:  Right, transferred.
17              MR. LEE:  That's what he said in his
18   testimony.
19   BY MR. KERNEN:
20       **Q.**    And you maintain contact with her?
21       **A.**    Working, you know, she work long time
22   here, she work same like this, it's 40 hours working,
23   60 hours like this.
24              MR. KERNEN:  Okay.  That's all I have
25   for now.

**[Page 162]**

---

ERRATA SHEET

2    Case name:  Nabi vs. Hudson Group
3    Date: October 7, 2014
4    Witness name:  Mohammad Nabi
5
6    PAGE/LINE        CHANGE        REASON
7    ___/___/_____/_____
8    ___/___/_____/_____
9    ___/___/_____/_____
10   ___/___/_____/_____
11   ___/___/_____/_____
12   ___/___/_____/_____
13   ___/___/_____/_____
14   ___/___/_____/_____
15   ___/___/_____/_____
16   ___/___/_____/_____
17   ___/___/_____/_____
18   ___/___/_____/_____
19   ___/___/_____/_____
20   ___/___/_____/_____
21   ___/___/_____/_____
22   ___/___/_____/_____
23   ___/___/_____/_____
24   ___/___/_____/_____
25   ___/___/_____/_____

**[Page 164]**

---

1             MR. LEE:  I just want to, for the
2    record, if I could get a copy for verification
3    purposes.
4             MR. KERNEN:  Did you order a copy of the
5    transcript?
6             MR. LEE:  You guys aren't going to give
7    me a verification copy?
8             MR. KERNEN:  Is it the rule?
9             MR. LEE:  I think for the federal rules
10   you're supposed to send over a copy for verification.
11            MR. KERNEN:  I'm not sure how it works
12   in New York.
13            MR. WANG:  Let me go and check on that.
14   I don't know.
15            MR. LEE:  Okay.  All right.  Thanks.
16            (Time noted:  4:50 p.m.)
17               *   *   *
18
19
20
21
22
23
24
25

**[Page 163]**

---

JURAT

2    Case name:  Nabi vs. Hudson Group
3    Date:  October 7, 2014
4         I, Mohammad Nabi, have read the
5    foregoing deposition and hereby affix my signature
6    that same is true and correct, except as noted
7    above.
8
9                   _____
                      Mohammad Nabi
10   THE STATE OF _____
11   COUNTY OF _____
12       Before me, _____, on this day
13   personally appeared Mohammad Nabi, known to me (or
14   proved to me on the oath of or through _____
15   (description of identity card or other document) to
16   be the person whose name is subscribed to the
17   foregoing instrument and acknowledged to me that
18   he/she executed the same for the purpose and
19   consideration therein expressed.
20       Given under my hand and seal of office on this
21   _____ day of _____, _____.
22
                   _____
23            NOTARY PUBLIC IN AND FOR
24            THE STATE OF _____
25   My Commission Expires: _____

**[Page 165]**

**[42]  (Pages 162 to 165)**

# EXHIBIT 2

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

MOHAMMED NABI and RIFAT RIZVI, on

behalf of themselves, FLSA

Collective Plaintiffs and the

Class,

                      Plaintiffs,

                             Civil Action No.

       -against-        14 CIV 4635(VEC)

HUDSON GROUP (HG) RETAIL, LLC,

AIRPORT MANAGEMENT SERVICES,

LLC and JOHN DOES 1-10,

                      Defendants.

------------------------------------x

                     October 9, 2014

                     12:15 p.m.


    Deposition of RIFAT RIZVI, taken by

Defendant, pursuant to notice, at the offices of

DLA Piper, LLP, 1251 Avenue of the Americas, New

York, New York, before SUZANNE PASTOR, a

Shorthand Reporter and Notary Public within and

for the State of New York.

1    Q.    You worked at a bank in Oman?
2    A.    Yes.  Habib Bank Limited.  I worked
3  there two and a half years.
4    Q.    Doing what?
5    A.    Doing machine operating, posting
6  machine operating.  This was when we have
7  computer.  It's posting.  And posting the
8  accounts, monies post to the account and
9  somebody need money --
10   Q.    Typing information into a computer?
11   A.    Like this, yes.
12   Q.    That was the nature of your job for
13 the two and a half years?
14   A.    Yes.
15   Q.    Did you get any promotions while
16 you were at the bank?
17   A.    No.  And I working dispatch,
18 dispatch, mail dispatching and machine
19 operating.
20   Q.    The mail dispatching was another
21 responsibility you had at the bank?  Or is that
22 another company?  That's something you did for
23 the bank, dispatch?
24   A.    Yes.  Dispatch and machine
25 operating.

[Page 10]

1    Q.    Why did you leave work at the bank?
2    A.    Because of my marry.  That I might
3  marry.  It was 1978.
4    Q.    I see.  Did you have any other jobs
5  either in Oman or Pakistan or anywhere else
6  before you came to the United States?
7    A.    No.
8    Q.    When you came to the United States,
9  what was your first job?
10   A.    My first job, in the grocery store.
11   Q.    Which grocery store?
12   A.    It's Coney Island Avenue, Brooklyn.
13   Q.    What kind of work did you do at the
14 grocery store?
15   A.    Cash register.
16   Q.    You worked the cash register?
17   A.    Yes.
18   Q.    How long did you work there?
19   A.    Maybe two months.
20   Q.    Why did you leave?
21   A.    That's why he says --
22   Q.    Who is "he"?
23   A.    Boss.  My boss.  He say I hired
24 this other lady.  That's why.
25   Q.    So he terminated you?

[Page 11]

1    A.    Yes.
2    Q.    Where did you go to work next?
3    A.    Next I work, it's 99 cents store as
4  a cashier.
5    Q.    Back to the grocery store, did the
6  boss tell you that you did anything wrong?
7    A.    No.
8    Q.    He just told you he hired somebody
9  else?
10   A.    Yes.  That's why the grocery store
11 is, door is all the time open.  And in the
12 winter I feel so cold.  That's why this
13 vegetable and fruit there.  And it's so cold I
14 feel.  I complain two, three times and he said
15 he don't want this door is closed.
16   Q.    The 99-cent store, is that in Coney
17 Island Avenue?
18   A.    No.  That's near DeKalb Avenue in
19 Brooklyn.
20   Q.    As a cashier, correct?
21   A.    Yes.
22   Q.    How long did you work at the
23 99-cent store?
24   A.    99-cent store, maybe six or eight
25 months.

[Page 12]

1    Q.    Why did you leave?
2    A.    That's why I am single parent
3  there, and I take care of my children.  And my
4  children is going high school.  Sometime my son
5  is making any problem and the school counselors
6  call me and I leave my job and I go in the
7  school.  And it's so many time my son is injury,
8  sometime on the road, sometime in the school,
9  then counselor call me and I go so many time,
10 leave the job and I go in the school and talk to
11 police and bring my baby.
12   Q.    I see.  So you left the job on your
13 own because you needed to devote more time to
14 your son and his school?  Is that why you left
15 the 99-cent store?
16   A.    No.  I don't left.  He fired me.
17 That's why --
18   Q.    I see.
19   A.    He say every day you have problems.
20   Q.    I see.  So he fired you, and the
21 reason he said was because of all these problems
22 that you have and things that you had to deal
23 with your son.
24   A.    Yes.  You need your home and you
25 take care of your children.

[Page 13]

**[4]  (Pages 10 to 13)**

1      Q.    What was the next paid job that you
2  had in the United States?
3      A.    Next one is Hudson News.
4      Q.    What month and year do you recall
5  that you joined Hudson News?
6      A.    June 13, 2003.
7      Q.    What was your initial position with
8  Hudson News?
9      A.    It's cashier.
10     Q.    And that's at the Penn Station
11 location, correct?
12     A.    Yes.
13     Q.    Who was your supervisor when you
14 first joined the company?
15     A.    Mr. Joe Khan.  He is general
16 manager.
17     Q.    Was there --
18          MR. LEE:  How are we spelling that?
19 Just so the reporter knows.
20     Q.    You said Joe Khan?
21     A.    Yes.  J-O-E.
22     Q.    And then K-H-A-N?
23     A.    Yes.
24     Q.    He was a general manager at the
25 time, correct?

[Page 14]

1      Q.    Is that yes?
2      A.    Yes.
3      Q.    Can you identify other people who
4  were managers of one kind or another at Penn
5  Station during the time that you were a cashier
6  at Penn Station?
7      A.    Sorry, can you ask me again?
8      Q.    Sure.  When you were a cashier at
9  Penn Station, Joe Khan was a general manager.
10     A.    Mm-hmm.
11     Q.    Right?
12     A.    Mm-hmm.
13     Q.    You have to say yes instead of
14 mm-hmm.
15     A.    Oh, sorry.  Yes.
16     Q.    That's okay.  Do you know the names
17 of other persons who also had the title manager
18 at Penn Station --
19     A.    Yes.
20     Q.    Wait until I finish my question.
21 Can you tell me the names of other people who
22 had the title manager at Penn Station during the
23 time that you were a cashier there?  And then
24 you say yes if it's yes.
25     A.    Yes.

[Page 16]

1      A.    Yes.
2      Q.    Were there any operations managers
3  that you considered to be your bosses?  This is
4  while you were a cashier at Penn Station.
5      A.    Operation manager, I don't know.
6  But it's Joe Khan there and one is manager
7  this store and she is working on the cash
8  register all the time.  As a cashier I started
9  work with her.
10     Q.    What was her name?
11     A.    Indira.
12     Q.    What's her last name?
13     A.    No, this is first name.
14     Q.    Indira is first or last name?
15     A.    I don't know last name.  But this
16 is first name.
17     Q.    Indira is first.
18     A.    Correct.
19     Q.    I see.  And you do not know the
20 last name.
21     A.    No.
22     Q.    Got it.  Well, you knew that Joe
23 Khan had a manager title.  He was general
24 manager, correct?
25     A.    Mm-hmm.

[Page 15]

1      Q.    Tell me the names.
2      A.    Names?  Indira, Igbal.  One is
3  Singh.  Singh.  He's from India.
4      Q.    Would Singh be spelled S-I-N-G-H?
5      A.    Yes.
6      Q.    Is Igbal I-G-B-A-L.
7      A.    Yes.
8      Q.    Do you know the last names of Igbal
9  or Singh?
10     A.    No.
11     Q.    Do you know what kind of managers
12 they were, Indira, Igbal or Singh?
13     A.    Indira is working on the cash
14 register.
15     Q.    I know she worked on the cash
16 register, but I think you said you thought she
17 was a manager of some sort, correct?
18     A.    Yes.
19     Q.    Do you know what her title was?
20 Was she a general manager like Joe Khan?
21     A.    No.  Store manager.
22     Q.    You considered her a store manager?
23     A.    Yes.
24     Q.    What did you consider Igbal to be?
25     A.    Igbal is giving to everybody change

[Page 17]

1      A.    Yes, at work.  And he is coming in
2    the store and he talking sometime with bad word.
3    And one day he's coming in the store and he is
4    looking my face and he is discuss about my face
5    and my body in front of customer and in front of
6    everybody.  Everybody the cashier is laughing
7    and the watchman is laughing.  And I feel so
8    bad.  And I complain Mr. Joe Khan, and Mr. Joe
9    Khan is thinking maybe I make a problem for him
10   or for Joe Khan.  That's why he is
11   brother-in-law.
12      Q.    He is what?
13      A.    Brother-in-law.
14          MR. LEE:  He's Joe Khan's
15   brother-in-law.
16      Q.    Brother-in-law, okay, got it.
17      A.    Okay.  And he send me that time
18   33rd Street.
19      Q.    What do you mean sent you to 33rd
20   Street?
21      A.    That's why this store is coming in
22   Penn Station.  33rd Street is PATH train
23   station.
24      Q.    So he moved you to a different
25   station?

[Page 46]

1    listen to my question and be responsive to the
2    question?
3      A.    Sure.
4      Q.    So you were at PATH station for a
5    month or month and a half, correct?
6      A.    Yes.
7      Q.    And your title was manager,
8    correct?
9      A.    Yes.
10     Q.    Did you then move to Grand Central
11   Station?
12     A.    Yeah, but I give you reason first
13   why he send me from 33rd to Grand Central.  Is
14   good or no?
15     Q.    It's good if I ask for that and I
16   would come back to that.  So why don't we just
17   establish, did you go direct from PATH station
18   to Grand Central Station?
19     A.    Yes.
20     Q.    Did Joe Khan make that move for you
21   or did you ask for it?
22     A.    No.  Joe Khan moved me.
23     Q.    And you stayed as a manager at
24   Grand Central Station until you were terminated,
25   correct?

[Page 48]

1      A.    Yes, different station one block
2    far.  Yes, he moved me over there and he give me
3    more headache over there, that's why I complain
4    about his brother-in-law.  And he give me
5    different schedule.  He said oh, come eleven
6    o'clock or 9:00 or 9:30, something like that.
7    What his brother-in-law working in the 33rd
8    Street too.  He start his job at 9:00 at night.
9    His name is Bozid.
10     Q.    So Joe Khan moved you from Penn
11   Station over to the PATH station.
12     A.    Yes.  33rd Street station.
13     Q.    How long did you work at the 33rd
14   Street station?
15     A.    Maybe one month or one and a half
16   months.
17     Q.    And you were a manager while you
18   were there, too?
19     A.    Yes.  Same thing as cash register
20   and watching and check --
21     Q.    I didn't ask you that yet.
22          MR. LEE:  Just let her answer
23   because she's trying to be responsive to your
24   question.
25     Q.    I think it would move faster if you

[Page 47]

1      A.    Yes.
2      Q.    During your time at PATH station
3    for a month or a month and a half, did you
4    perform the same set of duties as manager that
5    you did when you were at Penn Station?
6      A.    Penn Station, yes.
7      Q.    Did you do any additional functions
8    that you can recall while at PATH station
9    compared to when you were at Penn Station?
10          MR. LEE:  I'm sorry, what was the
11   question?  Did you do what?
12     Q.    Any additional job duties while at
13   PATH compared to at Penn Station.
14     A.    No.  The same thing.  Joe Khan
15   location this one or Penn Station, same all
16   there, too.
17     Q.    Turning to Grand Central Station.
18     A.    Yes.
19     Q.    During the time that you were
20   manager at Grand Central Station, did you
21   perform the same list of job duties that you've
22   already told us about for Penn Station while you
23   were at Grand Central?
24     A.    Means I work same thing?
25     Q.    That's the question.

[Page 49]

**[13]  (Pages 46 to 49)**

1    MR. LEE:  Yes, he's asking you if
2  you did the same thing.
3    A.   Yes, same thing.
4    Q.   Did you do anything -- so you did
5  the same ones that you did at Penn Station at
6  Grand Central, right?
7    A.   Yes.
8    Q.   In addition to those same ones,
9  were there any new ones that you were asked to
10  do while you were at Grand Central Station?  New
11  job functions compared to Penn Station.
12    A.   Only I bring from warehouse candy
13  and magazine also, chips also.
14    Q.   So while at Grand Central you would
15  actually go to the warehouse to get those things
16  and bring them back?
17    A.   Yes.  I make order first in the
18  store, I need Lays, how many Doritos I need, and
19  I go in the warehouse and take it out boxes.
20  And I bring the chips, candy box, gum and
21  magazine bundles.
22    Q.   Now, when you say you would make an
23  order, is that a written document that you would
24  fill out?
25    A.   No.  I write it down.

[Page 50]

1    Q.   Write it down on a piece of paper?
2    A.   Yes.
3    Q.   Write down the numbers of things
4  that you think you need for the --
5    A.   Yes.
6    Q.   Wait until I'm finished.  You would
7  write down the number of things that you think
8  you need for the store?
9    A.   Yes.
10    Q.   And then would you go yourself to
11  the warehouse and gather those things and bring
12  them back to the store?
13    A.   Yes.
14    Q.   How did you determine when you were
15  the manager at Grand Central Station how many
16  things that you needed for the store?
17    A.   Chips, candies, magazine.
18    Q.   Those are the kinds of things that
19  you refilled, right?
20    A.   No.  It's mostly at that time I
21  open morning time the store, mostly it's empty
22  store.  That's why evening shift is selling the
23  stuff.  Then mostly it's empty.  Then I bring
24  the magazine, I check magazine date and anything
25  is expired, I take it out and I go in the

[Page 51]

1  warehouse and give it to a warehouse manager.
2    Q.   Give the expired ones to the
3  warehouse manager?
4    A.   Yes.  Candy, everything, I take
5  from store.
6    Q.   You take the expired candy?
7    A.   Yes.
8    Q.   Give it to the warehouse manager
9  and he deals with it?
10    A.   Yes.
11    Q.   Then you get the new stuff and
12  bring it back?
13    A.   Yes.
14    Q.   How do you know how many new pieces
15  of candy and waters that you need to bring to
16  the store?
17    A.   I bring the boxes.  Sorry.
18    MR. LEE:  It's fine.
19    Q.   You bring boxes.
20    A.   Yes, boxes.
21    Q.   How do you know how many to bring?
22  How do you know to bring only one or ten boxes?
23  How do you decide how much stuff to bring?
24    A.   That's why I'm fixing.  I know how
25  many piece in this place.

[Page 52]

1    Q.   You know how many should be there?
2    A.   Yes.
3    MR. LEE:  We've been going for over
4  an hour now.  Can we take a quick break so I can
5  use the washroom?
6    MR. KERNEN:  Sure.
7    (Recess taken.)
8  BY MR. KERNEN:
9    Q.   During the time that you were
10  manager --
11    A.   Okay, I give you one answer more.
12    MR. LEE:  Just let him ask the
13  question.
14    Q.   I was going to a new area.
15    A.   The time you said more work you do
16  as a manager, and I remember one thing.
17    Q.   Okay, but I'm going to ask the
18  question so that we're clear.
19  You've told us some things that you
20  did when you were manager for Hudson already in
21  this deposition, correct?
22    A.   Yes.
23    Q.   You just started to try to tell us.
24  Was there some other activity that you did when
25  you were manager that you wanted to tell us

[Page 53]

[14]  (Pages 50 to 53)

1    the manager meetings?
2         A.    Yes.
3         Q.    What else?
4         A.    Different people said different
5    one. Somebody say we have short cashier, short
6    people, you hire people. And he say no, it's
7    not, it's not budget enough, like this.
8         Q.    So another example of information
9    that a manager would pass on to Mr. Soto in
10   these meetings is that the manager thinks that
11   more cashiers should be hired, right?
12        A.    Yes.
13        Q.    But Mr. Soto would decide, but the
14   manager would recommend that we think they
15   should hire more, correct?
16        A.    Yes.
17        Q.    What other things can you remember
18   managers telling Mr. Soto during this business
19   meetings about what they thought they needed to
20   make the business better?
21        A.    Mostly Mr. Soto said with
22   everybody. Mostly he said do this one, do this
23   one, do this one. Try this side, try this side.
24        Q.    So Mr. Soto would tell a manager
25   certain things to try in order to make the
                                              [Page 66]

1    business better.
2         A.    Yes.
3         Q.    What kind of things did he tell the
4    managers? You already mentioned about customer
5    service, about being pleasant and trying to sell
6    them new products, right?
7         A.    Yes.
8         Q.    Any other things you remember him
9    telling the managers to do and to try in order
10   to make business better? What other things?
11        A.    Mostly he's pressure for customer
12   service.
13        Q.    He would --
14        A.    Said is customer service is better
15   and business is more better. That's it.
16        Q.    When you were at Penn Station did
17   you also attend meetings with the general
18   manager?
19        A.    Yes.
20        Q.    Who was the general manager there?
21        A.    Joe Khan.
22        Q.    Did Mr. Khan provide similar
23   information and recommendations during these
24   meetings that Mr. Soto did? Did he say the same
25   kind of things?
                                              [Page 67]

1         A.    Yes. Same kind of things.
2    Customer service, why is business so low.
3         Q.    During the meetings with Mr. Khan,
4    did you and the other managers say the same kind
5    of things to him about we might need to hire new
6    cashiers and other things?
7         A.    Yes. Manager says you know I have
8    less cashier and I am working the whole day on
9    the other register. How I is to take care of
10   the customer service.
11        Q.    And these meetings with Mr. Khan,
12   were they also just managers and Mr. Khan at the
13   meetings?
14        A.    Yes. Managers and Mr. Khan. Every
15   time.
16        Q.    Understood. During the meetings
17   between managers and Mr. Khan or managers and
18   Mr. Soto, did the managers sometimes tell the
19   general manager about employees that were doing
20   poorly and were not working well?
21        A.    No.
22        (Rizvi Exhibit 3 for identification,
23   HUD 1379)
24        Q.    Ms. Rizvi, take a look at what
25   we've marked as Exhibit number 3. It's a
                                              [Page 68]

1    one-page document. First thing I want to ask
2    you, is that your handwriting in the lower
3    right-hand corner with the name and the date in
4    handwriting?
5         A.    Yes.
6         Q.    Do you recognize this document?
7         A.    I don't remember what is this.
8         MR. LEE: If you recognize it, just
9    say you recognize it. If you don't, let him
10   know.
11        A.    I don't remember.
12        Q.    You don't remember, okay. This is
13   your signature. But looking at it today, you
14   don't think you remember this.
15        A.    Yes. This is my signature, yes.
16        Q.    Would it be your usual practice to
17   read documents before you sign them?
18        A.    Yes, but sometimes I don't have
19   enough time, I read everything and sign. And
20   general manager says sign and I sign, that's it.
21   Sometimes I don't read.
22        Q.    And do you know whether or not you
23   read this before you signed it?
24        A.    Excuse me?
25        Q.    Do you know one way or the other
                                              [Page 69]

1  whether you did or you did not read this
2  document before you signed it?  Exhibit number
3  3.  If you don't remember, that's fine.
4      A.   I don't know.
5      Q.   You don't know?
6      A.   No.
7         (Rizvi Exhibit 4 for identification,
8  HUD 715)
9      Q.   Take a look at and please read
10  through Exhibit number 4.
11      A.   Number 4 here?
12      Q.   Number 4, correct.  We're calling
13  it Exhibit number 4.  It actually has another
14  numbering system.  It says HUD 00715.  It's
15  Exhibit 4.  It's a typewritten half page
16  document.  Is that your signature?
17      A.   Yes.
18      Q.   And did you print Rifat Rizvi?
19      A.   Yes.
20      Q.   And did you put the date?
21      A.   Yes.
22      Q.   Did you type this document?
23      A.   No.
24      Q.   Who typed it?
25      A.   I don't know.  That's why I don't

[Page 70]

1  know typing.
2      Q.   You don't know who typed it?
3      A.   No.  I don't know.
4      Q.   And do you know whether or not you
5  typed it?  Is it possible that you typed it?
6      A.   No, I don't know the typing.
7      Q.   Do you recall the situation that's
8  discussed in this letter?
9      A.   I don't know.  Maybe it's office
10  person, Mr. Nabi.
11      Q.   Well, let's take a look at this.
12  Do you know who Mr. Motasar is?
13      A.   Mr. Motasar?
14      Q.   Yes.  Who is that?
15      A.   Yes.  It's the cashier.
16      Q.   Who is Ishrat Sultana?
17      A.   Ishrat Sultana?
18      Q.   Yes.
19      A.   I don't know Ishrat.  But Sultana
20  is manager there.  I don't know her name is
21  Ishrat Sultana.
22      Q.   Is she some type of manager?
23      A.   Yes.
24      Q.   Who is Mr. Igbal?
25      A.   Igbal is shift in charge.

[Page 71]

1      Q.   In this letter you say, or whoever
2  typed this said that Sultana claimed that you
3  told Mr. Joe Khan to fire Sultana.  Do you
4  remember that?
5      A.   No.
6      Q.   You don't remember that situation?
7      A.   No.
8      Q.   Do you remember any of the --
9      A.   Why I say -- no.  Why I say you
10  fire someone?  Why?
11      Q.   Do you remember any of the facts or
12  events that are discussed in this document?
13      A.   No.
14         (Rizvi Exhibit 5 for identification,
15  HUD 728)
16      Q.   Ms. Rizvi, take a look at what
17  we've marked as Exhibit number 5.  It's a
18  one-page document called "acknowledgment of
19  receipt of Hudson retail employee manual."  Is
20  all the printing and handwriting on this page
21  yours?
22      A.   Yes.
23      Q.   Do you recall being given a copy of
24  the Hudson employee manual?
25      A.   Excuse me?

[Page 72]

1      Q.   Do you remember getting an employee
2  manual when you joined Hudson?
3         MR. LEE:  If you show her a copy,
4  it may help.  It's up to you.
5      Q.   I'll withdraw the question.  We can
6  come back to that.
7      A.   I don't know about this.  Maybe I
8  am not reading and I sign it.
9         (Rizvi Exhibit 6 for identification,
10  HUD 711 through 714)
11      Q.   Ms. Rizvi, take a look at what
12  we've marked as Exhibit number 6.  It's a
13  review, an employment review.  It's Bates
14  stamped, and this is the number in the lower
15  right-hand corner, 711 through 714.
16         Turn to page 714, please.  It's the
17  last one, the last page of this exhibit.  Is
18  that your signature next to "employee"?
19      A.   Yes.
20      Q.   Do you recall receiving a copy of
21  this document?
22      A.   I don't remember.
23      Q.   Let's go to the first page.  Now,
24  you recognize this as one of your employment
25  reviews?

[Page 73]

**[19]  (Pages 70 to 73)**

1  and he has a receipt, he brings the receipt, you
2  give this bag.
3      Q.  What other kind of information did
4  you share with other managers?
5      A.  One day I go in the magazine room
6  or chips room, is anything I want chips, this
7  chips is too back side.
8      Q.  What's that mean?
9      A.  It means chips box -- chips is
10  coming in the box.  Anything -- I want chips for
11  the store, the box in the back.
12      Q.  That's the box you prefer.
13      A.  Yes.
14      Q.  Why?  Because they're better chips?
15      A.  No.  This item he fits in the back.
16  Magazine manager.
17      Q.  I don't understand about --
18      A.  Means I need Dorito.  I open so
19  many box, Doritos is not there.  And I see in
20  the back one box I find.  Then I talk with other
21  manager, you need Dorito, the box is there.
22      Q.  I see.  So you're trying to help
23  other managers who might need Doritos by telling
24  them where they can find them.
25      A.  Yes.

[Page 106]

1      Q.  And that's a good thing because it
2  helps you sell more Doritos.
3      A.  Yes.  That's why I'm running all
4  the time and my watching is good and I watching
5  all the time.
6      Q.  And running all the time is good
7  why?  So you can keep an eye on all the
8  different stores?
9      A.  No.  Any place general manager send
10  me, he say okay, you check this store, and I
11  check this store.  Or I write down chips is for
12  bring chips, I write it down order for chips,
13  for soda or for candy.  And at that time I go in
14  the warehouse and I see everything there.
15      Q.  I see.
16      MR. LEE:  I'm sorry, I just had
17  something come up.  Do you mind if I take a
18  break and call my office?
19      MR. KERNEN:  That's fine.
20      MR. LEE:  It will probably just
21  take five minutes.  Sorry about that.
22      MR. KERNEN:  That's no problem.
23      (Recess taken.)
24  BY MR. KERNEN:
25      Q.  Going back to this evaluation, the

[Page 107]

1  same spot we were looking at, you'll see he
2  makes the comment "works with other
3  departments."  Do you see that?  It's in the
4  same sentence we were just looking at.
5      MR. LEE:  I'm sorry, what sentence,
6  Joe?
7      MR. KERNEN:  "Shares information
8  with manager and team" under "Sales team
9  support."  It's in the middle, second to last
10  category.
11      A.  Okay.
12      Q.  Right in the middle of the page it
13  says "works with other departments."  I want to
14  ask you what other departments do you recall
15  working with when you were a manager at Grand
16  Central?
17      A.  In the Grand Central, I don't work
18  any other department.
19      Q.  Not in other departments, but with.
20  Did you work with people in the human relations
21  department for anything?  That's just as an
22  example.  Yes or no.  If you didn't, that's
23  fine.
24      A.  No.
25      Q.  Can you think of any other

[Page 108]

1  departments within the company that you had some
2  work dealings with?
3      A.  Sorry, I don't understand question.
4      Q.  That's fine.
5      (Rizvi Exhibit 10 for identification,
6  HUD 1301 through 1304)
7      Q.  Please take a look at what we've
8  marked as Exhibit 10.  It's a multipage document
9  stamped 1301 through 1304.
10      Now, when you were a manager at the
11  various locations there were occasions where a
12  void had to occur with regard to a transaction,
13  correct?
14      A.  Yes.
15      Q.  And only a manager can approve a
16  void, correct?
17      A.  Yes.
18      Q.  Now, was there a little pad of
19  slips that you used in order to sign off to
20  approve voids of transactions?
21      A.  Yes.
22      Q.  Do you recognize the first page of
23  this document as being the cover of a packet of
24  void slips that you used?
25      A.  Yes.

[Page 109]

[28]  (Pages 106 to 109)

1      Q.   Now, do you see where it says "I
2  need new" on the front page?  Is that your
3  handwriting?
4      A.   Yes.
5      Q.   What did you mean by that when you
6  wrote that?  That you needed a new packet of
7  slips?
8      A.   Yes.
9      Q.   Now, these are a little difficult
10 to read.  We're not going to go through too
11 many, but on this next page, which is 1302, is
12 this an example of a register transaction void
13 that you approved with your signature where it
14 says "manager approval" at the bottom?
15     A.   Yes.  And it's my handwriting, too.
16     Q.   And same thing with the next two
17 pages.  It's your handwriting and you're signing
18 off on the void of a transaction as the manager,
19 correct?
20     A.   Yes.
21         (Rizvi Exhibit 11 for identification,
22 HUD 1589 through 1590)
23     Q.   Take a look at what we've marked as
24 Exhibit 11.  It's a position job summary for
25 warehouse/distribution center manager at Hudson.

[Page 110]

1  performed the job functions of specialty brand
2  manager for Hudson News?
3      A.   No.
4         (Rizvi Exhibit 13 for identification,
5  HUD 61 through 62)
6      Q.   Look at Exhibit 13.  It's a job
7  summary for cafe manager.
8      A.   No.
9      Q.   Have you ever performed -- give me
10 a second -- the job responsibilities or job
11 functions of a cafe manager for Hudson News?
12     A.   No.
13     Q.   Have you ever worked in any Hudson
14 News airport newsstand or work location?
15     A.   No.
16     Q.   Do you have any firsthand knowledge
17 of observing what managers do in any of the
18 airport Hudson News stores?
19     A.   I don't know about this.  But I'm
20 not work.
21     Q.   You never worked in the airports.
22     A.   No.
23     Q.   And you never had any experience
24 studying what the managers do or don't do in the
25 airport Hudson News locations, correct?

[Page 112]

1  Did you ever perform the job or job functions of
2  warehouse manager?
3      A.   No.
4      Q.   Do you have firsthand experience of
5  observing what a warehouse manager does all day?
6      A.   Yes.
7      Q.   How much time do you spend in the
8  warehouse during a shift?
9      A.   Start at the 6:00 in the morning --
10     Q.   I'm sorry, not they.  During your
11 shift as manager, for example, at Grand Central,
12 how much time during your shift are you spending
13 in the warehouse?
14     A.   Spending in the warehouse, half an
15 hour.
16     Q.   Half an hour?
17     A.   Yes.
18     Q.   During the entire shift, just a
19 half an hour?
20     A.   Yes.
21         (Rizvi Exhibit 12 for identification,
22 HUD 55)
23     Q.   Take a look at what we've marked
24 Exhibit 12.  Job description for the position of
25 specialty brand manager.  Have you ever

[Page 111]

1      A.   Yeah, one lady's transfer from
2  LaGuardia to Grand Central.  She's manager.
3      Q.   When she was at LaGuardia, did you
4  ever observe her doing her job?
5      A.   Same thing.
6      Q.   You gotta listen to my question
7  remember.  It's a yes or no question.  When this
8  woman worked at LaGuardia Airport as a manager,
9  did you ever observe her doing her job?
10     A.   In LaGuardia?
11     Q.   Yes.
12     A.   No, I don't know.
13     Q.   So you never had any firsthand
14 experience watching her do her job to verify
15 what she does or doesn't do, correct?
16     A.   Sorry.
17     Q.   I can withdraw that question.  What
18 is this woman's name that you were just
19 referring to?
20     A.   Rajider.
21     Q.   How do you spell that?
22     A.   R-A-J-I-D-E-R.
23     Q.   Say it again.
24     A.   R-A-J-I-D-E-R.
25     Q.   Is that her first name?

[Page 113]

1  suggestion?
2       A.   Yes.
3       Q.   Do all employees give suggestions
4  on how to improve the business?
5            MR. KERNEN:  Objection.
6       A.   Yes.  Everybody, cashier, manager,
7  everybody.
8       Q.   Everybody gives suggestions to
9  Mr. Soto to help improve the business?
10      A.   Yes --
11           MR. KERNEN:  Objection.
12      A.   Yes.
13      Q.   But you didn't have any authority
14  to hire or fire any specific person, right?
15      A.   No.
16           MR. KERNEN:  Objection.
17      Q.   And did any of the other managers
18  have authority to hire or fire any specific
19  people?
20      A.   No.
21           MR. KERNEN:  Objection.
22      A.   No, only general manager.
23      Q.   And did any of the other managers
24  even interview other applicants?
25      A.   No.

[Page 134]

1  presentations?
2            MR. KERNEN:  Objection.  You're not
3  reading from the comments.
4       A.   No.
5            MR. KERNEN:  Just to be clear,
6  these aren't Mr. Soto's comments.  That's just
7  an overall description of potential things under
8  communication.
9            MR. LEE:  That's right.
10      Q.   So you never delivered
11  presentations, right?
12      A.   No.
13           MR. KERNEN:  Objection.
14      Q.   Under "decision-making judgment,"
15  it says you sort through complex issues.  Did
16  you ever sort through complex issues?
17           MR. KERNEN:  Objection.
18      A.   Complex issues, no.
19      Q.   Did you ever systematically gather
20  information?
21           MR. KERNEN:  Objection.
22      A.   No.
23      Q.   Did you ever make timely decisions
24  or make difficult decisions using consensus when
25  possible?

[Page 136]

1            MR. KERNEN:  Objection.
2       Q.   Earlier you testified that you
3  would also suggest to the general manager what
4  types of food to order to sell well.  Do you
5  remember that?
6       A.   Sorry?
7       Q.   Earlier you testified you told the
8  general manager what types of food products to
9  order because you think they would sell well.
10  Do you remember that?
11      A.   Food?  No.
12      Q.   Like candy or certain types of
13  products.  You didn't make that recommendation?
14           MR. KERNEN:  Objection.
15      A.   Yes, in the Penn Station, one time.
16      Q.   You only said that one time.  And
17  it was just a suggestion, right?
18      A.   Yes.  Everybody do the suggestions
19  in the meeting and I give my suggestion too for
20  better business.
21           MR. LEE:  I'm showing the witness
22  what's marked as Rizvi number 9.
23      Q.   Under the first -- I'm sorry, under
24  the heading "communication," it says that you
25  deliver presentations.  Did you ever deliver

[Page 135]

1            MR. KERNEN:  Objection.
2       A.   I don't take any decision.  I don't
3  take any decision.  Decision take is Mr. Soto.
4       Q.   Under "office administration" on
5  the second page it says, "Demonstrates knowledge
6  and understanding of back office functions,
7  including payroll."  Did you have any knowledge
8  of that?
9       A.   No.
10           MR. KERNEN:  Objection.
11      A.   No, never.
12      Q.   Does this review properly reflect
13  your actual work responsibilities at the
14  company?
15           MR. KERNEN:  Objection.
16      Q.   I'm saying this document and what
17  it says in here, does it accurately reflect the
18  actual work you do?
19      A.   No.  No, no.
20      Q.   Similarly, where the other reviews
21  that we had reviewed today, did those review
22  accurately reflect your actual job
23  responsibilities at the company?  Did the other
24  performance reviews similar to this one, did
25  they accurately reflect your actual job?

[Page 137]

[35]  (Pages 134 to 137)

1       MR. KERNEN:  Objection.
2       A.   No.
3       Q.   I'm going to refer you to Exhibit
4   7. I'm sorry, these all look identical so I'm
5   not going to go through all of them.
6            When you were a cashier, how many
7   hours a day did you work typically?
8       A.   Cashier, eight hours.
9       Q.   And you testified earlier you just
10  did regular cashier work, right?
11      A.   Yes.
12      Q.   I think you adjusted the candy
13  also, right?
14      A.   Yes.
15      Q.   Now, when you became a manager, you
16  testified earlier that you had additional job
17  duties.  Do you remember that?
18      A.   Yes.
19      Q.   And some of those additional job
20  duties included writing in the logbook, right?
21      A.   Yes.  Making void.
22      Q.   Making void transactions.
23      A.   Yes.
24      Q.   And getting the money bags.
25      A.   Yes.

[Page 138]

1   the ones that you ticked off earlier?
2            MR. LEE:  That's right.  The ones
3   that she said are her manager duties.
4            MR. KERNEN:  The ones that you
5   ticked off.  The ones that you asked in your
6   leading question.  You didn't list them all.
7   You chose to list only two.
8            MR. LEE:  Let me ask my question
9   and don't interrupt me.
10      A.   Sorry, again.
11      Q.   You said you spent about 60 hours,
12  the least that you worked was 60 hours.
13      A.   Yes.
14      Q.   And you just mentioned that you
15  only spent approximately 45 minutes to an hour
16  during the new managerial duties that you were
17  given after you became a manager, right?
18      A.   Yes.
19           MR. KERNEN:  Objection.
20      Q.   So that means approximately every
21  week you only spent about six hours or so doing
22  the new managerial duties?
23           MR. KERNEN:  Objection.
24      Q.   Is that correct?
25      A.   New manager duty, six hours.  No,

[Page 140]

1       Q.   And opening the restaurant --
2   opening the store.
3       A.   Yes.
4            MR. KERNEN:  Objection.
5       Q.   Now, these additional job duties,
6   how much time a day after you became manager,
7   how much time a day did you spend on those
8   duties?
9       A.   45 minutes to one hour.
10      Q.   And the rest of the time you were
11  just doing stocking and cashier work?
12           MR. KERNEN:  Objection.
13      A.   Yes.  Watching, mostly I watching.
14      Q.   And your regular -- the regular
15  length of a workday when you were manager was
16  how many hours?
17      A.   Mostly I work ten hours a day.  And
18  sometime he need my help and it's -- I work --
19  it's 8:00 at night sometime in the week,
20  sometimes 65, 66.  But not less than 60.
21      Q.   So assuming a 60-hour week, would
22  you say that only approximately six hours were
23  devoted to your additional new managerial
24  duties?
25           MR. KERNEN:  Objection.  You mean

[Page 139]

1   at least watching --
2       Q.   Well, the actual number of hours a
3   week you spent doing managerial work --
4            MR. KERNEN:  Objection.
5       Q.   -- the new managerial work is only
6   an hour.
7            MR. KERNEN:  Objection.
8       Q.   So that would be six hours.
9       A.   Six hours, yes.
10      Q.   Now, you mentioned -- there was
11  testimony earlier regarding how you would tell
12  your general manager to order more food.  Do you
13  remember that?  Or to order more products for
14  the store.  Do you remember that?
15      A.   Yes, I said this one is selling
16  good, yes.
17      Q.   Do you actually need to make any
18  decisions or have any expert knowledge in order
19  to tell your general manager what additional
20  foods to buy?
21           MR. KERNEN:  Objection.
22      A.   No.  That's why I am working as a
23  cashier and I know people like this candy, needs
24  more than other candy.
25      Q.   For example, you would just tell

[Page 141]

1  him to buy more if something's elementary,
2  right?
3          MR. KERNEN:  Objection.
4      A.    Yes.
5      Q.    So if you see something empty, you
6  just tell him to order more of it.
7          MR. KERNEN:  Objection.
8      A.    Yes.
9      Q.    Now, earlier you testified about
10 your knowledge of people that worked at the
11 airport.  Do you recall that?
12         MR. KERNEN:  Objection.
13     A.    Yes.
14     Q.    Did you ever have an employee,
15 another manager from another airport that was
16 transferred to work with you?
17     A.    Only one --
18     Q.    Rajinda, right?
19     A.    Transferred but she is
20 transferred before me.  That time I transferred
21 she is transferred before me.
22     Q.    So she was already there at Grand
23 Central before you came there?
24     A.    Yes.
25     Q.    And did she explain to you her job

[Page 142]

1  duties as a manager at the airport?
2      A.    Same thing.
3          MR. KERNEN:  Objection.
4      A.    And one, two time people coming
5  from Jersey station, same thing.
6      Q.    You're saying Rajinda told you all
7  the managers at the airport do the same things
8  you guys do at Grand Central, right?
9          MR. KERNEN:  Objection.
10     A.    Yes.
11     Q.    And then other managers from New
12 Jersey came and told you that managers in New
13 Jersey also did --
14     A.    Yes.
15         MR. KERNEN:  Objection.
16     Q.    -- the same work as you as a
17 manager in Grand Central, correct?
18         MR. KERNEN:  Objection.  Objection.
19     A.    Everybody say I am manager
20 but it's only for name.
21     Q.    Only for the title.
22     A.    Yes.  Only for the title.
23     Q.    But they're basically doing manual
24 labor?
25         MR. KERNEN:  Objection.

[Page 143]

1      A.    Yes, but Hudson News use us.
2      Q.    And so is it your understanding and
3  knowledge that all the managers at all the
4  stores throughout the United States owned by the
5  Hudson stores, do they all do the same work as
6  you?
7          MR. KERNEN:  Objection.  That's the
8  most ridiculous question I've ever heard.  But
9  you can answer.
10     A.    Yes.  Anybody talk with me, he says
11 every place the same thing.
12     Q.    Thank you.  It's the same company,
13 right?
14     A.    Yes, same company.
15         MR. LEE:  Thank you.
16 EXAMINATION CONTINUED
17 BY MR. KERNEN:
18     Q.    All the managers at all the Hudson
19 News stores in all the United States do the same
20 thing, right?  Same as you.
21     A.    What do you mean same?  The hours?
22     Q.    Yes.
23     A.    Yes.
24     Q.    So all of the Hudson News managers
25 in California do the same thing as the managers

[Page 144]

1  at Grand Central, right?
2      A.    I don't talk about is anybody they
3  come from California.  I talk about two person.
4  One person is coming from LaGuardia and two
5  managers come from New Jersey.
6      Q.    Oh, I see.  I see.
7      A.    This is same thing.  It's
8  everywhere.
9      Q.    I see.  So when you agreed to the
10 leading question that all the managers in the
11 United States do the same thing as you do in
12 Grand Central, you were talking about one person
13 from an airport and two people from New Jersey
14 who told you things, right?
15     A.    Yes.  Yes.
16         MR. LEE:  Wait, let her finish.
17 They said what?
18     A.    They said is everywhere the same
19 bullshit.
20     Q.    Ah, okay.  And you told us the name
21 of the woman from the airport.  What were the
22 names of the people from New Jersey?
23     A.    I don't work with them.  I don't
24 know names.  I work with Rajinda.  That's why I
25 know her name.

[Page 145]

[37]  (Pages 142 to 145)

1    Q.   So you cannot give us the names of
2  the two people -- let me finish -- from New
3  Jersey who said some things about managers
4  elsewhere, right?
5    A.   Yes.
6        MR. LEE:  If you can remember the
7  name, you should tell him.  If you don't, you
8  don't.  It's okay.
9    A.   I don't remember.
10   Q.   You don't know the names.
11   A.   Yeah.
12   Q.   And other than what you've told me
13 that they said, which is it's the same
14 everywhere, it's bullshit, anything else at all
15 that you can remember they said about this
16 topic?  Or is that it?
17   A.   No, it's this kind of work.  That's
18 why title is manager.  But work is labor job.
19 That's why.
20   Q.   Other than saying that statement,
21 anything else that you can remember they said on
22 that topic?
23   A.   Sorry?
24   Q.   This is my chance to try to learn
25 what you know.  So if there's anything else that

1  these two people whose names you can't remember
2  from New Jersey said about manager positions
3  elsewhere, I want you to tell me now.  And if
4  it's nothing, it's nothing.
5    A.   Not really.  I don't remember.  I
6  remember, I give you name.  That's why I don't
7  work with them.
8    Q.   I understand that you don't know
9  their name.  Is it also true that you can't tell
10 me anything else that they said about this topic
11 of what managers do elsewhere?
12   A.   No, only this one, that's it.
13   Q.   I know it's only that one, but is
14 there anything else that these two people said
15 to you about what other managers do other than
16 what you've already testified to today?
17   A.   Sorry, I don't understand.
18   Q.   Can you remember anything else that
19 you learned from these two managers from New
20 Jersey about Hudson News manager work?  Anything
21 else you can remember about what they said that
22 you can tell me today?  Yes or no.
23       MR. LEE:  Well, let me help.  Did
24 they tell you --
25       MR. KERNEN:  No, you can ask

1  questions afterwards.
2    Q.   Is there anything else that you can
3  remember that these two managers said about the
4  nature of their work or other managers' work
5  that you haven't told us already?
6    A.   That was all -- only this one.  I
7  don't know, maybe he talk with other persons is
8  too much.  But he's not my friend and I don't
9  know him, it's to me.  He is talking about any
10 other person.
11       MR. WANG:  Note for the record that
12 opposing counsel is clearing his throat once
13 again as he's done periodically throughout these
14 proceedings.
15       MR. LEE:  What is that supposed to
16 mean?
17       MR. WANG:  While his witness is
18 answering.
19       MR. KERNEN:  You're improperly
20 trying to coach the witness.
21       MR. LEE:  Are you crazy?  Just for
22 the record, I'm deeply offended.  This is
23 ridiculous.  And she's talking the whole time.
24       MR. WANG:  She's giving an answer
25 you don't like.  Which she did earlier this

1  morning.
2        MR. LEE:  She's just testifying.
3  I'm standing on the side listening here.
4        MR. WANG:  Also you interjected
5  your own leading questions throughout.
6        MR. LEE:  I can ask her whatever
7  question I want to ask.  I'm trying to help
8  because he's asking her questions that are like
9  50 words long.  She can't keep track of it.
10       MR. WANG:  She didn't even
11 understand your questions.  So don't give us
12 recommendations on how to question --
13       MR. LEE:  I'm trying to make it
14 easier.  Look, go ahead, let's not evolve into
15 immaturity.
16   Q.   Ms. Rizvi, you've given some
17 testimony --
18       MR. LEE:  Can I clear my throat
19 while he's asking questions?
20       MR. WANG:  There's been a pattern
21 of you clearing your throat every time --
22       MR. LEE:  You weren't even here.
23 You just got here 15 minutes ago.
24       MR. WANG:  I was here in the
25 morning.

1       MR. LEE:  You just got here 15
2    minutes ago.
3       MR. WANG:  I was here in the
4    morning and yesterday.
5       MR. LEE:  You didn't raise it
6    yesterday.
7       MR. WANG:  I didn't raise it the
8    first time.
9       Q.    Ms. Rizvi, you've given some
10   testimony this afternoon about managers from New
11   Jersey who transferred to New York, correct?  Do
12   you remember that testimony?  Your lawyer asked
13   you some questions.
14      A.    Yeah, but I said no.
15      Q.    You said some things about what
16   they told you.  Remember that testimony?  I'm
17   not asking what it was again.  But your lawyer
18   asked you some questions and you mentioned two
19   managers from New Jersey who came to New York,
20   right?
21      A.    Oh, no, no.  He don't came to New
22   York.  Only one lady I mentioned, she
23   transferred.  But the other guy is not transfer.
24      Q.    Oh, I see.
25      A.    The other guy is coming sometime,

[Page 150]

1    with me directly.
2       Q.    Right.  The man in New York talked
3    to you directly.
4       A.    Yes.  The people is talking and I
5    hear this.
6       Q.    Okay.
7       A.    That's it.
8       Q.    And when you answered the questions
9    of your lawyer, you were talking about what the
10   man in New York told you about New Jersey.
11      MR. LEE:  Object.  That's not the
12   what she testified.
13      A.    No.
14      MR. LEE:  Stop putting words in her
15   mouth.
16      MR. KERNEN:  I'm allowed to ask
17   leading questions, unlike you.
18      MR. LEE:  You're not allowed to
19   lead her with incorrect testimony and assume
20   that --
21      A.    He said is anybody is coming from
22   other location, they say same thing.  I said
23   this one.
24      Q.    And the man in New York said that,
25   right?

[Page 152]

1    taking stuff from the Penn Station and meet his
2    friends.  That's it.  Sometime people is coming
3    from there.
4       Q.    Oh, I see.
5       A.    That's why I don't know name.
6       Q.    I see.  So you've never spoken to
7    any Hudson News managers who actually work in
8    New Jersey Hudson News stores, correct?  Is that
9    correct?
10      A.    Yes.
11      Q.    But you've spoken to someone who's
12   a manager in New York who himself has been in
13   New Jersey and told you some things that he
14   thinks he knows about New Jersey, right?
15      A.    Yes.
16      Q.    And you don't remember the name of
17   this New York person, right?
18      A.    No.
19      Q.    You don't remember the name.
20      A.    No.
21      Q.    And other than what you've already
22   told us that this man said about New Jersey, can
23   you tell us anything else that he told you about
24   the New Jersey workers?
25      A.    It's New Jersey worker is not talk

[Page 151]

1       A.    No, man is New Jersey.
2       Q.    Did he say that directly to you?
3       A.    No.  It's New York.
4       MR. LEE:  She overheard a
5    conversation between a man from New Jersey and
6    New York.  It's plain as day.
7       MR. KERNEN:  I didn't realize it
8    was even that attenuated.  I thought it was a
9    little more direct.  So the layers of hearsay
10   are kind of hard to peel away.
11      MR. LEE:  You can bring that up
12   later when we make our motion.
13      Q.    Is there anything else about this
14   conversation that you overheard that you can
15   remember today and tell us about?
16      A.    No.  Only this one, that's it.
17      Q.    Only what you've said already,
18   right?
19      A.    No, he said they make manager,
20   Hudson News is making manager for hard work.
21   This person is who's making hard work, they
22   promote this person.
23      Q.    Did he say anything else about that
24   issue?
25      A.    He said oh, Hudson News is

[Page 153]

[39]  (Pages 150 to 153)

1   bullshit.  That's it.
2       Q.     I remember you saying that.  Did he
3   say anything else about these issues?
4       A.    No.
5       Q.     You testified about the -- I think
6   your lawyer called it a cash bonus that you
7   recommended for that woman.  How do you refer to
8   it?  Gift card, cash bonus?  How do you refer to
9   that?
10      A.    No, company give gift card.
11      Q.     And there was only one person one
12  time that you recommended that.
13      A.    Yes.
14      Q.     You weren't restricted to only
15  recommending it one time.  You could have
16  recommended it more if you felt it was proper,
17  correct?
18      A.    Yes.
19      Q.     And you just chose to do it the one
20  time.
21      A.    Yes.
22          (Continued on the following page to
23  include jurat.)
24
25

**[Page 154]**

---

1   WITNESS: _____
    DATE(S): _____
2   CASE: _____
3   I wish to make the following changes, for the
    following reasons:
4
    PAGE LINE _____
5   ____ ____ CHANGE FROM:_____
6   ____ ____ CHANGE TO: _____
    REASON:_____
7   ____ ____ CHANGE FROM:_____
8   ____ ____ CHANGE TO: _____
    REASON:_____
9   ____ ____ CHANGE FROM:_____
10  ____ ____ CHANGE TO: _____
    REASON:_____
11  ____ ____ CHANGE FROM:_____
12  ____ ____ CHANGE TO: _____
    REASON:_____
13  ____ ____ CHANGE FROM:_____
14  ____ ____ CHANGE TO: _____
    REASON:_____
15  ____ ____ CHANGE FROM:_____
16  ____ ____ CHANGE TO: _____
    REASON:_____
17  ____ ____ CHANGE FROM:_____
18  ____ ____ CHANGE TO: _____
    REASON:_____
19  ____ ____ CHANGE FROM:_____
20  ____ ____ CHANGE TO: _____
    REASON:_____
21  ____ ____ CHANGE FROM:_____
22  ____ ____ CHANGE TO: _____
23  Subscribed and sworn to before me this _____ day
    of _____, 2014.
24
25

**[Page 156]**

---

1           MR. KERNEN:  That's all I have at
2   this time.
3           (TIME NOTED:   5:00 p.m.)
4
5       RIFAT RIZVI
6
7   Subscribed and sworn to before me
8   this        day of        , 2014.
9
10  _____
11  Notary Public
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**[Page 155]**

---

1           C E R T I F I C A T E
2
3   STATE OF NEW YORK  )
4               : SS.
5   COUNTY OF NEW YORK )
6
7       I, SUZANNE PASTOR, a Shorthand
8   Reporter and Notary Public within and for the
9   State of New York, do hereby certify:
10      That RIFAT RIZVI, the witness whose
11  deposition is hereinbefore set forth, was duly
12  sworn by me and that such deposition is a true
13  record of the testimony given by the witness.
14      I further certify that I am not
15  related to any of the parties to this action by
16  blood or marriage, and that I am in no way
17  interested in the outcome of this matter.
18      IN WITNESS WHEREOF, I have hereunto
19  set my hand this_____, 2014.
20
21      _____
22      SUZANNE PASTOR
23
24
25

**[Page 157]**

**[40]  (Pages 154 to 157)**

# EXHIBIT 3

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------X

MOHAMMED NABI and RIFAT RIZVI, on behalf of
themselves, FLSA Collective Plaintiffs and
the Class,

                              Plaintiffs,

        -against-          Case No.
                           14 CIV 4635 (VEC)


HUDSON NEWS COMPANY, HUDSON GROUP LLC,
HUDSON GROUP (HG) RETAIL, LLC, AIRPORT
MANAGEMENT SERVICES, LLC and JOHN DOES 1-10,

                              Defendants.
---------------------------------------------X
                    October 16, 2014
                    10:22 a.m.

                    30 East 39th Street
                    New York, New York




        DEPOSITION of HUDSON GROUP LLC, a

Defendant herein, by MICHAEL MULLANEY, taken

by the Plaintiffs, pursuant to Federal Rules

of Civil Procedure, and Notice, held at the

above-mentioned time and place, before Kristi

Cruz, a Notary Public of the State of New York.

6

M. MULLANEY

1
2     Q    Is there any reason why you would
3   not be able to respond to the questions
4   provided to you today honestly and truthfully?
5     A    No.
6     Q    Okay, good.
7          I'm showing the witness what's
8   marked as Exhibit 1.  I'm showing the witness
9   what's a copy of the Notice of Deposition
10  pursuant to rule 30(b)(6) of the Federal
11  Rules, and there's a series of topics under
12  this deposition notice.
13         Do you see that, sir?
14    A    Do you know which topics you are
15  being provided here today to respond to?
16         MR. KERNEN:  I can confirm
17    that for the record.
18         MR. LEE:  Okay, sure.
19         MR. KERNEN:  Mr. Mullaney
20    will give 30(b)(6) testimony on
21    topics 7, 8, 9, 10, 11, and 13, as
22    clarified and defined in
23    Defendant's Amended Responses To
24    30(b)(6) Deposition Notice.
25         MR. LEE:  Okay.  So --

7

M. MULLANEY

1
2          MR. KERNEN:  7 through
3    9 -- I'm sorry.
4          MR. LEE:  7 through 11 and
5    13.
6          MR. KERNEN:  7 through 11
7    and 13.
8          MR. LEE:  Okay, great.
9          If I could just go off the
10   record one second.  Thanks.
11         (Recess was taken.)
12    Q    Mr. Mullaney, what is your current
13  title for the Hudson Group?
14    A    I'm the executive vice president
15  of strategy and development.
16    Q    When I say Hudson Group, what are
17  the corporate entities that are included in
18  the Hudson Group?
19    A    Hudson Group is -- it's kind of
20  a -- I don't know if it's officially called a
21  trade name, but it refers to a wide range of
22  companies that were -- we have partial or full
23  ownership of.  Hudson Group has a very diverse
24  and complicated business structure, with a
25  significant amount of variety of ownership

8

M. MULLANEY

1
2   interests and places where we do business.
3     Q    Okay.
4     A    The four main companies, the top
5   in an organizational structure is Hudson Group
6   (HG), Inc.; that wholly owns Hudson Group (HG)
7   Retail, LLC; that owns AMS --
8     Q    I'm sorry.  So Hudson Group (HG),
9   Inc. owns Hudson Group (HG) Retail, LLC?
10    A    Yes.
11    Q    It's 100 percent ownership?
12    A    Yes.
13    Q    And what else?
14    A    And there's a company called AMS.
15         MR. KERNEN:  Which stands
16    for what?
17         THE WITNESS:  Well, the
18    legal entity name is AMS.
19    Q    It's Airport Management Services,
20  right?
21    A    Yes, but it's not called Airport
22  Management Services; it's called AMS, LLC.
23    Q    Oh.  Is that its legal name, AMS
24  LLC?
25    A    I believe so.

9

M. MULLANEY

1
2     Q    It's not Airport Management
3   Services, LLC?
4     A    I don't know exactly.
5     Q    How is AMS LLC held; is it held
6   under Hudson Group (HG) Retail, LLC?
7     A    It's under Inc.
8     Q    Oh, it's under Inc., okay.
9     A    It's 100 percent owned by AMS and
10  Inc.
11    Q    So it's a sister company, right,
12  to the Hudson Group (HG) Retail, LLC?  It's a
13  side by side?
14    A    It's 100 percent owned.
15    Q    By Hudson Group (HG), Inc.?
16    A    Inc., correct.
17    Q    Hudson Group (HG), Inc. also owns
18  100 percent of the Hudson Group (HG) Retail,
19  LLC?
20    A    Yes.
21    Q    Any other companies owned by
22  Hudson Group (HG), Inc.?
23    A    Yes.  There is Dufry North
24  America.
25    Q    I'm sorry?

10

M. MULLANEY

2    A   Dufry, D-U-F-R-Y, North America.
3  That is 100 percent owned by Hudson Group
4  (HG), Inc.  And there are a very wide, very
5  large number of companies under both AMS LLC
6  and under Hudson Group (HG) Retail.  In total
7  under Hudson Group (HG), Inc., there are over
8  150 different lease agreements.  About 88
9  lease agreements are under Hudson Group (HG)
10  Retail, about 50 are under AMS, LLC, and I
11  think there are about seven under Dufry North
12  America, and several agreements are actually
13  held by Hudson Group (HG), Inc.
14    Q   I just want to back up a little
15  bit.
16          Where is Hudson Group (HG), Inc.
17  incorporated?
18    A   I don't know exactly.
19    Q   But it's a U.S. company, right?
20    A   Yes.
21    Q   Do you know if it's a Delaware
22  company?
23    A   I don't know.
24    Q   Or New Jersey?
25    A   I don't know.

11

M. MULLANEY

2    Q   Is Hudson Group (HG), Inc., like,
3  owned by a foreign company?
4    A   We're a wholly owned subsidiary of
5  Dufry AG, D-U-F-R-Y, A-G, based out of Basel,
6  Switzerland, traded on the Swiss Exchange.
7    Q   And the Hudson Group (HG), Inc.
8  is, I guess, one of many companies owned by
9  this conglomerate in Switzerland, right?
10    A   Yes.  Dufry operates in over 48
11  countries.
12    Q   Sure, yeah, I've seen Hudson Group
13  even in Hong Kong and other places.
14    A   That's correct.
15    Q   Now, the business operations of
16  Hudson Group (HG), Inc., can you describe what
17  its business is?
18    A   Hudson Group (HG), Inc. or any of
19  its -- any of the other entities, AMS, Hudson
20  Group (HG) Retail, or any of the JV, joint
21  ventures that we're an owner of, we operate
22  retail stores, a wide variety of retail stores
23  and brands in airports and in transit
24  locations.  We have over 700 stores in 70
25  markets, and by market, I mean New York is a

12

M. MULLANEY

2  market.
3    Q   How many markets?
4    A   Over 70.
5    Q   Okay.
6    A   We operate a wide variety of
7  brands.  Some of those brands are proprietary
8  and owned.  So one of our proprietary brands
9  is Hudson News.  That's a brand that we
10  started business with back about 27 years ago.
11  And we operate a wide variety of what we call
12  proprietary brands; Hudson, Hudson News.  We
13  operate specialty retail stores that are
14  proprietary, such as Kidsworks, Discover.  We
15  also license specialty retail brands and
16  operate them in those environments, such as
17  Coach, Bulgari, Harley Davidson, Sunglass Hut.
18  We operate over a hundred different specialty
19  retail brands.
20    Q   Now, the Hudson News part of the
21  business, is that operated through Hudson
22  Group (HG) Retail, LLC?
23    A   No.
24    Q   Is it operated through Airport
25  Management Services, LLC?

13

M. MULLANEY

2    A   No.
3    Q   Where is it operated through?
4    A   Every location that we operate in,
5  we have a lease.  That lease is with a
6  landlord.  The landlord may be an airport, it
7  may be an entity such as the MTA, it may be --
8  those are probably the two best examples.
9    Q   Okay.
10    A   The 150 leases we have, I'll give
11  you an example, such as St. Louis.  In
12  St. Louis, we have a lease agreement with the
13  airport that gives us the right to operate a
14  number of stores.  So in St. Louis, we may
15  operate -- I don't know the exact number, but
16  I believe it's about 20 stores.  Those 20
17  stores will have a lease agreement, and we
18  have a requirement to operate certain brands.
19  That brand mix will be composed of Hudson or
20  Hudson News stores or other newsstands, as
21  well as specialty stores.
22    Q   Okay.  But --
23    A   So Hudson News is a brand that is
24  operated in a variety of our locations under
25  the lease agreements.  If that lease agreement

14

1           M. MULLANEY
2  provides us to operate a newsstand, then
3  that's the brand we operate under.
4       Q     But the lease agreements, that
5  could be signed by either AMS, LLC or Hudson
6  Group (HG) Retail?
7       A     The lease agreements are entered
8  into by the specific corporate entity doing
9  business there.  So when I said we have a
10 number of joint venture agreements, we have, I
11 believe, 70 joint venture agreements.  For
12 example, the lease in St. Louis is signed by
13 the joint venture.  The joint venture is
14 comprised of Hudson and local business
15 partners.
16      Q     But the Hudson part of that joint
17 venture would either be AMS, LLC or Hudson
18 Group (HG) Retail?
19      A     It could also be under Dufry North
20 America, Inc., or it could be Hudson Group
21 (HG), Inc.  The entity that is the partner
22 with our local partners would be a variety of
23 those.
24      Q     Is there any specific methodology
25 as to which company would be entering into

15

1           M. MULLANEY
2  which JVs?
3       A     Yes.
4       Q     What's the methodology?
5       A     The -- to explain that, I have to
6  explain a little bit of a history of Hudson
7  Group.
8       Q     Sure.
9       A     Okay.  Hudson Group was created
10 about 27 years ago as a private company; it
11 was privately owned.  Mario DeDomizio was the
12 president and founder and created the Hudson
13 News concept.  LaGuardia Airport was the first
14 airport back in the late '80s.  Hudson then
15 added a number of locations in the New York
16 area, both airport and transit.
17         Hudson Group continued to grow as
18 a private company until 2003.  In 2003, Hudson
19 acquired a competitor called WHSmith.  They
20 acquired their airport operations in North
21 America.  At that time when the acquisition of
22 WHSmith was completed, the company created
23 Airport Management Services.
24      Q     I'm sorry, can you say that again?
25      A     The company AMS, Airport

16

1           M. MULLANEY
2  Management Services, was created as part of
3  the Smith acquisition.
4       Q     Oh, okay.
5       A     And leases after that time were
6  entered into under the AMS entity.
7       Q     Okay.
8       A     Several years ago, the private
9  owners of Hudson sold to an investment banking
10 firm, Advent, Advent International, and
11 subsequent to that we were acquired by Dufry.
12 Advent had a controlling interest of Dufry,
13 and they merged us with Dufry, and that's when
14 we became a subsidiary of Dufry and a publicly
15 traded company.  Hudson Group (HG), Inc. was
16 created when we became part of Dufry, so there
17 were some -- we changed some of the corporate
18 entities and added structure to those mergers.
19         As we enter into leases currently,
20 we enter -- we primarily entered into them as
21 Hudson Group (HG) Retail.  So moving forward,
22 we tend not to sign leases under AMS, LLC and
23 put the majority of our new businesses into
24 the Hudson Group (HG) Retail.
25      Q     The AMS portion, that's really

17

1           M. MULLANEY
2  part of your corporate history due to
3  reorganization or restructuring?
4       A     There was a corporate structure.
5  I was not part of Hudson at the time; I joined
6  in 2004.  So there was a structural reason for
7  that.
8       Q     Now, in terms of the newsstands
9  that's being operated by the Hudson Group,
10 would you say that, I guess, all the
11 newsstands are basically being, you know, run
12 and operated ultimately by the Hudson Group
13 (HG), Inc.?
14      A     No.
15      Q     How would you describe it?
16      A     I would describe it as they're run
17 and managed by the local business structure
18 that is entering into the lease.  So again,
19 I'll use the example of St. Louis.  All of the
20 stores under St. Louis are run by that joint
21 venture, which is comprised of a Hudson entity
22 and local partners.
23      Q     But the operations part of it, the
24 running the store, that's all done by the
25 Hudson Group, right?

18

```
 1        M. MULLANEY
 2     A    No.
 3     Q    Oh, okay.
 4     A    No, it is done by the local joint
 5  venture.  So, for example, all of the
 6  employees in St. Louis are employees of that
 7  joint venture.  Their paychecks, the name on
 8  the paycheck that they're paid by is by that
 9  local joint venture.  That local joint venture
10  has the business partners in airports.  There
11  is something called Airport Concession
12  Disadvantaged Business Enterprises.  The
13  acronym is ACDBE.  It's a federal program.
14  Airports are required under federal law to
15  have a certain level of ACDBE participation in
16  commercial contracts.  That percentage varies
17  airport by airport because it has to be
18  locally based, the percentage of
19  participation.
20        So in a place like St. Louis, we
21  have multiple business partners, and they have
22  specific roles and responsibilities under the
23  joint venture agreement.  They actually have
24  responsibility on behalf of the joint venture
25  to manage several of the stores within the
```

19

```
 1        M. MULLANEY
 2  joint venture on behalf of the joint venture.
 3        So we have a joint venture
 4  agreement that covers our business
 5  relationship, that dictates the
 6  responsibilities for the majority owner, which
 7  in that case is a Hudson Group entity, and
 8  responsibility for the minority owners.
 9     Q    So what's the responsibility for
10  the Hudson Group portion by running the
11  individual stores?
12     A    Typically there will be a number
13  of stores -- I'll give an example.  If an
14  airport had ten stores, and let's say we had a
15  20 percent ACDBE participation.  Hudson Group
16  would have responsibility for eight of them;
17  the ACDBE would have responsibility for two of
18  them.
19        So Hudson locally, we would have a
20  general manager, and that general manager has
21  responsibility for the eight stores.  The
22  ACDBE has in the organization someone who's
23  called a partner manager.  They're really a
24  general manager, but we couldn't really have
25  two similar titles.  So we have a partner
```

20

```
 1        M. MULLANEY
 2  manager, and that partner manager reports to
 3  the ACDBE and manages that store or stores
 4  under the direction of the ACDBE partners.
 5        Under the joint venture agreement
 6  and under FAA guidance, the joint venture
 7  partners have to have control and
 8  responsibility which is clearly defined and
 9  articulated, which it is in the joint venture
10  agreement.  We cannot dictate or control
11  department manager, meaning Hudson.  The
12  Hudson general manager cannot tell the partner
13  manager what to do.  They have to get their
14  direction from the ACDBE partners.
15     Q    Let's just switch to, let's say,
16  New York.  So for the Grand Central stores, is
17  that operated pursuant to a joint venture?
18     A    The Grand Central lease is signed
19  under Hudson Group Retail, LLC and is
20  100 percent owned by Hudson Group Retail, LLC.
21     Q    I'm sorry, what's the entity name?
22     A    Hudson Group Retail, Hudson Group
23  (HG) Retail.
24     Q    Oh, okay, (HG) Retail, okay, LLC.
25  So it's signed directly by Hudson Group (HG)
```

21

```
 1        M. MULLANEY
 2  Retail, LLC?
 3     A    Yes.
 4     Q    And there's a number of stores in
 5  Grand Central, right?
 6     A    Yes.
 7     Q    How many are there?
 8     A    I don't recall exactly because I
 9  believe one was captured about a year ago.
10     Q    There was about six or seven.
11  Does that sound about right?
12     A    No, I believe it is only three or
13  four.  I'd have to check the lease for the
14  exact number.
15     Q    But for however many stores are in
16  Grand Central, it's all operated through
17  Hudson Group (HG) Retail, LLC?
18     A    That is correct.  We do not have
19  any business partners for the Grand Central
20  lease.
21     Q    And then for Penn Station, do you
22  know how many stores there are?
23     A    No.
24     Q    Is it also five or six?
25     A    No, it is -- the Penn Station
```

22

1          M. MULLANEY
2  operation has more stores than Grand Central
3  Station.  I don't recall exactly how many are
4  in Penn Station.
5      Q     However many stores there are, are
6  they also operated and owned through Hudson
7  Group (HG) Retail?
8      A     Yes.
9      Q     And they're all wholly owned,
10 right?  No joint venture partners?
11     A     That is correct.
12     Q     And then there's PATH train Hudson
13 Group, also, right?
14     A     We have a variety of transit
15 leases.
16     Q     Do you know if the PATH train one
17 is also owned directly --
18     A     When you say -- I'm not sure what
19 lease you're referring to when you say PATH.
20     Q     Okay, really?  Let me enter an
21 exhibit and it might make things easier.
22          MR. LEE:  If I can have
23      this marked as Mullaney 2.
24          (Mullaney Exhibit 2, List
25      of various Hudson Group stores,

24

1          M. MULLANEY
2  says One Meadowland Plaza.  That is our
3  corporate office, so that's not a store.
4      Q     Okay.
5      A     There are other locations in here
6  that --
7      Q     For example, do you see the one
8  that says Grand Central?  It's towards the --
9      A     On the first page?
10     Q     Yes, on the first page, towards
11 the second half of the page, second half of
12 the bottom.
13     A     It says Grand Central Station,
14 yes, I see that.
15     Q     Is that intended to enumerate
16 store locations?
17     A     I do not know.
18          MR. KERNEN:  C.K., this
19      may be a list of leases.
20          MR. LEE:  Oh, okay.
21          MR. KERNEN:  But I think
22      we've got to clarify that with
23      Rick.
24          MR. LEE:  Okay, great.
25          MR. KERNEN:  But we got

23

1          M. MULLANEY
2      marked for identification, as of
3      this date.)
4      Q     I'm showing the witness what's
5  marked as Exhibit 2.  Do you know what this
6  document is, sir?
7      A     No.
8      Q     It seems to me that it's a list of
9  the various Hudson Group locations for stores.
10 Does that seem to be accurate?
11          MR. KERNEN:  Objection.
12     A     Again, I've not seen this list
13 before, so I'm not sure what it is.
14     Q     Take some time and take a look and
15 see if these are a listing of stores that you
16 would be aware of.
17     A     (Witness looking at document.)
18          I don't know if these are stores
19 or just physical locations of warehouses or
20 other receiving areas.  For example, I guess
21 this is page one?
22     Q     Yeah.  The first page is what's
23 marked as HUD 02374.
24     A     Okay.  Page one there is a list,
25 it says Hudson Group, and Ship to Address it

25

1          M. MULLANEY
2      into this in talking about PATH.
3      On the second page, there's
4      references to PATH.
5      Q     So you're not sure if this Excel
6  spreadsheet is a list of stores or other types
7  of operations?
8      A     I do not know.
9      Q     Do you see the column that says
10 City?
11     A     Yes.
12     Q     Are these all the cities that
13 Hudson News operates Hudson News newsstands
14 in?
15     A     No.
16     Q     Are there more or less?
17     A     More.
18     Q     Within the U.S., or do you mean
19 outside the U.S.?
20     A     Within the U.S.
21     Q     Oh, really?  Okay.  What's missing
22 from this list, just off the top of your head?
23     A     I couldn't say exactly.  I said
24 earlier we operate in 70 markets.
25     Q     Is that domestically or --

26

M. MULLANEY

2    A    Domestically, in the United States
3  and Canada.  This list does not appear to list
4  our 70 different markets or cities.
5    Q    In terms of the employees that are
6  hired by each -- do you know what BLTN board
7  means?
8           MR. KERNEN:  In the last
9           column?
10          MR. LEE:  Yes, in the last
11          column, under location ID.
12   A    I do not.
13   Q    Do you know what any of the
14  writings mean in the last column?
15   A    No.
16   Q    So the individual joint ventures,
17  do they have their own handbooks for their
18  employees, or do they use, like, a central
19  handbook from a main office?
20          MR. KERNEN:  If you know
21          that level of detail.
22   A    I don't know that.  I don't know
23  that level of detail.
24   Q    Who would know?
25   A    I believe Rick would know, Rick

27

M. MULLANEY

2  Yockelson, head of people, HR and people.
3    Q    So if I could summarize quickly, I
4  guess, the structure of the Hudson Group
5  enterprise, you have at the top Dufry HG,
6  which is an overseas Swiss company that owns
7  all of the U.S. company Hudson Group (HG),
8  Inc., right?
9    A    Dufry owns -- yes, that is
10  correct, Dufry owns 100 percent.
11   Q    And Hudson Group (HG), Inc. owns a
12  number of entities, but I guess the entities
13  we're concerned about are Hudson Group (HG)
14  Retail, LLC, another company called AMS, LLC,
15  and we're not sure whether it's actually
16  Airport Management Services, LLC, and then a
17  third company Dufry North America, Inc.; is
18  that right?
19          MR. KERNEN:  Objection.
20   A    I believe that is what I said
21  earlier.
22   Q    Okay.
23   A    To my recollection, Dufry owns
24  Hudson Group (HG), Inc., which own Hudson
25  Group (HG) Retail, which owns AMF, LLC, and

28

M. MULLANEY

2  also owns Dufry North America.  And under AMS,
3  LLC and under Hudson Group (HG) Retail, there
4  are a large number of leases that are signed
5  by those joint ventures.  So yeah.  I keep
6  referring to St. Louis, I think St. Louis is
7  on my mind maybe because of baseball, but
8  St. Louis is under Hudson Group (HG), Inc.
9    Q    Some joint ventures or stores are
10  leased directly through the parent U.S.
11  company, right?  And some are through the
12  three subsidiaries, right?
13   A    The leases can be entered into
14  under any of those four main entities we
15  discussed, or the lease could be signed by the
16  local joint venture, with the majority owner
17  of that joint venture being one of those three
18  or four entities.
19   Q    Got it.  Now --
20   A    It's actually a very
21  complicated -- it's a very complicated
22  business structure.
23   Q    I used to do corporate work, so
24  I'm aware of bizarre and idiosyncratic
25  corporate structures just purely by history of

29

M. MULLANEY

2  business operations.
3           So if you operate in so many
4  different markets in the U.S., how many
5  individual stores, approximately, would that
6  be?
7    A    We have approximately 770 stores,
8  and that's in North America.
9    Q    Including Canada?
10   A    The United States and Canada.
11   Q    Do you know how many is just for
12  the U.S.?
13   A    I would say in excess of 600, but
14  I don't know if that is an exact number.
15   Q    So you'd say approximately?
16   A    Approximately, yes.
17   Q    Who are the corporate officers of
18  Hudson Group (HG), Inc.?
19   A    There are five corporate officers.
20  There's Joseph DeDomizio, who is our president
21  and CEO; Jay Marshall, who is our corporate
22  counsel; Adrian Bartella, who is our CFO; Bill
23  Wolf, who is in finance; and myself.
24   Q    And I guess they overlook all the
25  businesses of Hudson Group (HG), Inc. plus all

# EXHIBIT 4

1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------X

MOHAMMED NABI and RIFAT RIZVI, on behalf of
themselves, FLSA Collective Plaintiffs and
the Class,

                              Plaintiffs,

          -against-          Case No.
                             14 CIV 4635 (VEC)


HUDSON NEWS COMPANY, HUDSON GROUP LLC,
HUDSON GROUP (HG) RETAIL, LLC, AIRPORT
MANAGEMENT SERVICES, LLC and JOHN DOES 1-10,

                              Defendants.
---------------------------------------------X
                    October 16, 2014
                    11:40 a.m.

                    30 East 39th Street
                    New York, New York
```

          DEPOSITION of HUDSON GROUP LLC, a

Defendant herein, by RICHARD YOCKELSON, taken

by the Plaintiffs, pursuant to Federal Rules

of Civil Procedure, and Notice, held at the

above-mentioned time and place, before Kristi

Cruz, a Notary Public of the State of New York.

54

R. YOCKELSON

2 they say because I'm not there with them.
3    Q    If I could refer you to page nine
4 of the Complaint.  Have you had a chance to
5 look at paragraph 31?  It states that
6 plaintiff Nabi worked for Hudson Group from
7 September '91 to May 12, 2013 in Grand
8 Central.
9            Is the narrative in paragraph 31
10 accurate?
11    A    No.
12    Q    What is not accurate about it?
13    A    It says he's a newspaper stand
14 worker.  That's not his title.
15    Q    What do you believe his title to
16 be?
17    A    Assistant ops.
18    Q    He was an assistant operations
19 manager?
20    A    Yes.
21            MR. KERNEN:  Actually,
22        we've clarified the facts in our
23        answer to this paragraph, but
24        you're free to ask the questions.
25    Q    In paragraph 32, the last

55

R. YOCKELSON

2 sentence, it states, "Plaintiff Nabi reported
3 to the assistant general manager, who in turn
4 reported to the general manager Bob Khan."  Is
5 that correct?
6            MR. KERNEN:  Objection.
7    A    I don't know Bob Khan.  Bob Khan
8 died before I got to the company, so I have no
9 knowledge of him.
10    Q    Okay.
11    A    I don't know if he did or didn't
12 report to him.  I don't even know if that was
13 his name, Bob Khan.
14    Q    I think it was Joe Khan, right?
15    A    Yeah.  Now -- I'm sorry.  There
16 are a lot of Joe Khans.  So again, it gets
17 confusing.  They all have different names, but
18 they call themselves English names.  Like
19 they're all Mohammed Khans, but some call
20 themselves Joe, some call themselves Moe.  I
21 really don't know who he's referring to here.
22    Q    I get it, I get it.  But would it
23 be fair to say that plaintiff Nabi reported to
24 an assistant manager, who in turn reported to
25 a general manager?

56

R. YOCKELSON

2            MR. KERNEN:  Objection.  I
3        mean --
4    Q    Is that correct?
5            MR. KERNEN:  I mean, he
6        had several positions across his
7        tenure sort of lumped together
8        here.
9            MR. LEE:  Hey, Bob --
10        sorry, Joe.  Joe, if you have an
11        objection, you can state it, but
12        you're not supposed to testify for
13        the witness.  I'm going to
14        overlook what's been happening,
15        but I need to have him testify,
16        okay?  Can we agree on that?
17            MR. KERNEN:  He's here to
18        testify.  I'm here to clarify.
19            MR. LEE:  You're not here
20        to clarify.  He can clarify for
21        himself.  Thank you.
22    A    I don't know who Nabi reported to.
23    Q    You don't know him personally?
24    A    I don't know him personally, I
25 don't know what he did in the location, I

57

R. YOCKELSON

2 don't know who he reported to in the location.
3    Q    Generally, as a group practice,
4 would an assistant operations manager report
5 to an assistant general manager, who in turn reported
6 to a general manager?
7            MR. KERNEN:  Objection.
8        You're talking about train
9        stations?  Airports?  What period
10        of time?
11    A    In each location, some report
12 directly.  Some locations don't have an
13 assistant general manager.  Some report right
14 to the GM, some report to the AGM, that's what
15 we call assistant general managers.
16    Q    Okay.  That's fine.
17    A    So I really don't know.
18    Q    Sometimes they do, sometimes they
19 don't?
20    A    Sometimes they do, sometimes they
21 don't.
22    Q    If I could have you turn the page.
23 In paragraph 33 it states, "During his
24 employment, Mohammed Nabi delivered and
25 collected newspapers, worked at a cash

58

R. YOCKELSON

1 register, watched customers at the front desk,
2 stocked shelves, and assisted customers to
3 find merchandise."
4      Would those be certain duties that
5 plaintiff Nabi performed while he was employed
6 at Hudson Group?
7           MR. KERNEN:  Objection.
8      A      He was with the company for 22
9 years in many different jobs.  He could have
10 done that.  He could have been hired as a
11 stock person, a cashier.  I don't know his
12 history of employment.
13     Q      Well, could he have done that
14 while he was an assistant operations manager?
15     A      I'm sure he could have did that,
16 plus a myriad of other things since that time.
17     Q      Other assistant operations
18 managers also performed similar duties,
19 correct?
20          MR. KERNEN:  Objection.
21     Airports, train stations, the size
22     of the location?
23     Q      Yes?
24     A      I mean, theft is much more


59

R. YOCKELSON

1 prevalent in train and bus stations as it is
2 in airports --
3      Q      I'm sorry, I need you to answer
4 the question.  Is the answer yes?  Because I
5 saw you nodding your head.
6      A      I don't think in -- I don't think
7 that in airports they collect newspapers.  I
8 think that's much more prevalent in the bus
9 and train terminals.  I think watching
10 customers prevent theft is much more -- so I
11 wouldn't say in the airports that they would
12 do all of these things as described.
13     Q      But --
14     A      They assist customers to find
15 merchandise, they may get on a register from
16 time to time.
17     Q      For both airports and train
18 stations, right?
19     A      Correct.
20     Q      And also for both airports and
21 train stations, they assist customers to find
22 merchandise, right?
23     A      At times.
24     Q      Assistant general managers would

60

R. YOCKELSON

1 also help stock shelves if needed, right?
2           MR. KERNEN:  Assistant
3      general managers?
4      Q      Assistant operations managers,
5 right?
6      A      Yes, I believe.
7      Q      And these duties that are
8 described in paragraph 33 with respect to
9 assistant operations managers, they do that
10 throughout the day while they're working; is
11 that correct?
12          MR. KERNEN:  Objection.
13     A      No, there are some assistant
14 managers who never get on a cash register.  It
15 depends upon the location, who called out
16 sick, how busy they are.  You know, there's so
17 many circumstances.
18     Q      Sure.  It varies day-to-day,
19 right?  If somebody calls out sick, then the
20 operations manager would jump in and do the
21 cashier register, right?
22     A      In some locations where they don't
23 have --
24     Q      Is that correct?

61

R. YOCKELSON

1      A      In some locations; not in all.
2      Q      In all locations the assistant
3 operations managers could be working a cash
4 register, right?
5      A      In all or some?
6      Q      Yeah.
7      A      You said in all?
8      Q      Yeah, in Hudson News newsstands;
9 is that right?
10          MR. KERNEN:  Objection.
11     A      It would be a guess on my part.
12 I've been in many locations where they have
13 enough people that the assistant ops never had
14 to get on a register, and in some locations
15 where they don't have that many, and I can
16 definitely see them getting on in an
17 emergency.
18     Q      But on an as-needed basis, an
19 assistant operations manager could be working
20 a cash register, right?
21     A      They would get on if they needed
22 to be, yes.
23     Q      Now, as part of the job
24 requirements for an assistant operations

70

R. YOCKELSON

1   dollar amount for their weekly salary may be
2   different, but the type of information that's
3   provided is identical?
4   A   That's correct.
5   Q   Correct?
6   A   Yes.
7   Q   Thank you.
8       (Discussion held off the
9       record.)
10      MR. LEE:  Let's mark this
11      as number 4.
12      (Yockelson Exhibit 4, Pay
13      stubs, marked for identification,
14      as of this date.)
15  Q   I'm showing the witness Exhibit 4.
16  These are, I guess, pay stubs that Ms. Rizvi
17  had actually kept on her own.  These look
18  substantially similar to Mr. Nabi's; is that
19  correct?
20  A   Yes.
21  Q   Again, everybody else in New York
22  got a similar type of wage statement form,
23  right?
24  A   That's correct.

1       R. YOCKELSON
2   dollar amount for their weekly salary may be
3   different, but the type of information that's
4   provided is identical?
5   A   That's correct.
6   Q   Correct?
7   A   Yes.
8   Q   Thank you.
9       (Discussion held off the
10      record.)
11      MR. LEE:  Let's mark this
12      as number 4.
13      (Yockelson Exhibit 4, Pay
14      stubs, marked for identification,
15      as of this date.)
16  Q   I'm showing the witness Exhibit 4.
17  These are, I guess, pay stubs that Ms. Rizvi
18  had actually kept on her own.  These look
19  substantially similar to Mr. Nabi's; is that
20  correct?
21  A   Yes.
22  Q   Again, everybody else in New York
23  got a similar type of wage statement form,
24  right?
25  A   That's correct.

71

1       R. YOCKELSON
2   Q   My question for you is:  If you
3   look at these pay stubs, the hours worked, are
4   they accurate?  Because they only show 40, but
5   she probably worked more as an exempt
6   employee; is that correct?
7   A   I don't know how many hours she
8   worked, but I can tell you how the system
9   works.
10  Q   Sure.
11  A   ADP, we pay exempt managers on an
12  exception basis, which means they get paid
13  their weekly salary, or biweekly if it's out
14  of New York, unless we are told differently.
15  So if somebody works 20 hours for that week,
16  they get paid 40.  If they work 50, they get
17  paid 40.  They get paid on an exception basis.
18  If we're told that a person was out, then we
19  have to make a correction in the system.
20      So what I'm saying is the system
21  automatically pays them a full week's pay, and
22  just the hours are put in there to signify
23  that they get their full week's pay.  It has
24  no indication of how many hours they actually
25  worked.

72

1       R. YOCKELSON
2   Q   And that applies to all of the
3   assistant operations managers?
4   A   It applies to every exempt person
5   in the company, myself included.
6   Q   Throughout the country, right?
7   A   Yes.
8   Q   Thank you.  In terms of assistant
9   operations managers, let's say somebody in New
10  York at the train station, how many minutes a
11  day do they spend training new employees?
12      MR. KERNEN:  Objection.
13  A   I have no idea.
14  Q   Could it be zero?
15  A   Could it be zero?
16  Q   Yes.
17  A   On any given day?
18  Q   Sure.
19  A   Sure, on any given day.
20  Q   Is it possible that an assistant
21  operations manager could be working the cash
22  register the whole day because two people
23  called in sick and they were understaffed?
24      MR. KERNEN:  Objection.
25  A   May have happened.

73

1       R. YOCKELSON
2   Q   And is it possible for an
3   assistant operations manager to be working on
4   stocking all of the day because the stocking
5   person called in sick?
6       MR. KERNEN:  Objection.
7   A   Again, it could be possible.
8   Q   And it's possible not just in New
9   York but throughout the country, right?
10      MR. KERNEN:  Objection.
11  A   No, I wouldn't say that.
12  Q   Why not?
13  A   Because I don't think in the
14  airports stocking is a full-time job, even
15  if --
16  Q   Oh, okay.  But they could be doing
17  cashier work the whole day, right?
18      MR. KERNEN:  Objection.
19  Q   Right?
20  A   In an airport?
21  Q   Yes.
22  A   Somewhere?
23  Q   Yes.
24  A   Possible.
25  Q   I'm showing the witness what was

74

R. YOCKELSON

1    previously marked in another deposition
2    Nabi 11.
3         Q    Do you know if this is the
4    employee handbook that was given to the
5    plaintiffs in this case?
6         A    This is one version of it.  I
7    mean, we've modified it through the years.
8    There's not a date on this one, so I don't
9    know.
10        Q    When you modify it, do you
11   redistribute the employee handbook to
12   employees?
13        A    Yes.
14        Q    Do you make them sign an
15   acknowledgement form again after they receive
16   a new employee handbook?
17        A    Yeah, I believe so.
18        Q    Is it the same employee handbook
19   that's given to all employees throughout the
20   country?
21        A    Throughout the U.S.
22        Q    Thank you.
23        Who is Cheryl Edone?
24        A    Cheryl Edone is the director of

74
1         R. YOCKELSON
2    previously marked in another deposition
3    Nabi 11.
4         Q    Do you know if this is the
5    employee handbook that was given to the
6    plaintiffs in this case?
7         A    This is one version of it.  I
8    mean, we've modified it through the years.
9    There's not a date on this one, so I don't
10   know.
11        Q    When you modify it, do you
12   redistribute the employee handbook to
13   employees?
14        A    Yes.
15        Q    Do you make them sign an
16   acknowledgement form again after they receive
17   a new employee handbook?
18        A    Yeah, I believe so.
19        Q    Is it the same employee handbook
20   that's given to all employees throughout the
21   country?
22        A    Throughout the U.S.
23        Q    Thank you.
24        Who is Cheryl Edone?
25        A    Cheryl Edone is the director of

75

R. YOCKELSON

1
2    human resources for Hudson Group.
3         Q    Would she be involved in
4    implementing wage and hour policies for the
5    Hudson Group?
6         A    Depends upon what time frame.
7    Before I joined the company, she was in charge
8    of HR.
9         Q    That was ten years ago?
10        A    Yeah.
11        Q    Oh, okay.
12        A    I took her place.
13        Q    But she's still working there,
14   right?
15        A    Yes, but she's under me now.
16        MR. LEE:  If I could have
17   this marked as Yockelson 5.
18        (Yockelson Exhibit 5, Job
19        summary sheet, marked for
20        identification, as of this date.)
21        Q    I'm showing the witness what's
22   marked as Yockelson 5.
23        Before I go into that, assistant
24   general managers, could they also just be
25   working a cash register the entire day if

76

R. YOCKELSON

1
2    they're short staffed?
3         A    You asked me that previously, and
4    I said it could happen.
5         Q    Okay.  Thank you.
6         MR. LEE:  Can you read
7    back my question, please?
8         (Record read.)
9         Q    I'm showing the witness -- I'm
10   sorry.
11        And your answer is yes, right,
12   sir?
13        A    It could happen.
14        Q    I'm showing the witness what's
15   been marked as Exhibit 5.  Have you seen this
16   document before, sir?
17        A    Yes.
18        Q    What position is this for; is this
19   for assistant operations manager that you had
20   described before?
21        A    Yes.
22        Q    Do you know who prepared this
23   document?
24        A    When I joined the company in '05,
25   we instituted job descriptions.  We sent out

77

R. YOCKELSON

1
2    all the different titles to all the different
3    executives and managers in the field and asked
4    them to give us what the people who worked for
5    them in these roles performed, compiled it
6    all, put it together in this document, sent it
7    back out for approval, and once it was
8    approved, we sent it out.  So it was a
9    conglomerate effort of people in the
10   operations division putting together these job
11   descriptions.
12        Q    After it was finalized, what did
13   you guys do with it?
14        A    We sent them out.
15        Q    To who?
16        A    To the locations.
17        Q    What did the locations do with
18   them?
19        A    They probably gave them to the
20   people whose job descriptions fit, because
21   there's different job descriptions.
22        Q    But you're not sure if they
23   actually gave it to them, are you?
24        A    No.
25        MR. KERNEN:  Off the

# EXHIBIT 5

JUDGE CAPRONI

JS 44C/SDNY
REV. 4/2014

**CIVIL COVER SHEET**

14 CV 4635

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

JUN 2 5 2014

PLAINTIFFS
MOHAMMED NABI and RIFAT RIZVI

DEFENDANTS
HUDSON NEWS COMPANY, HUDSON GROUP, LLC, HUDSON GROUP (HG) RETAIL LLC, AIRPORT MANAGEMENT SERVICES, LLC and JOHN DOES #1-10

ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER
Lee Litigation Group, PLLC
30 East 39th Street, Second Floor, New York, NY 10016
(212)465-1188

ATTORNEYS (IF KNOWN)

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

The Fair Labor Standards Act, as amended, 29 U.S.C. § 201 et. seq.  Plaintiffs seek unpaid wages and other compensation.

Has this action, case, or proceeding, or one essentially the same been previously filed in SDNY at any time? No ☑ Yes ☐ Judge Previously Assigned

If yes, was this case  Vol. ☐ Invol. ☐  Dismissed. No ☐ Yes ☐   If yes, give date _____ & Case No. _____

Is this an international arbitration case?   No ☒   Yes ☐

*(PLACE AN [x] IN ONE BOX ONLY)*   **NATURE OF SUIT**

**TORTS**                                                           **ACTIONS UNDER STATUTES**

| CONTRACT | PERSONAL INJURY | PERSONAL INJURY/ | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 INSURANCE | [ ] 310 AIRPLANE | [ ] 367 HEALTHCARE/ | [ ] 625 DRUG RELATED | [ ] 422 APPEAL | [ ] 375 FALSE CLAIMS |
| [ ] 120 MARINE | [ ] 315 AIRPLANE PRODUCT | PHARMACEUTICAL PERSONAL | SEIZURE OF PROPERTY | 28 USC 158 | [ ] 400 STATE |
| [ ] 130 MILLER ACT | LIABILITY | INJURY/PRODUCT LIABILITY | 21 USC 881 | [ ] 423 WITHDRAWAL | REAPPORTIONMENT |
| [ ] 140 NEGOTIABLE | [ ] 320 ASSAULT, LIBEL & | [ ] 365 PERSONAL INJURY | [ ] 690 OTHER | 28 USC 157 | [ ] 410 ANTITRUST |
| INSTRUMENT | SLANDER | PRODUCT LIABILITY | | | [ ] 430 BANKS & BANKING |
| [ ] 150 RECOVERY OF | [ ] 330 FEDERAL | [ ] 368 ASBESTOS PERSONAL | | | [ ] 450 COMMERCE |
| OVERPAYMENT & | EMPLOYERS' | INJURY PRODUCT | | PROPERTY RIGHTS | [ ] 460 DEPORTATION |
| ENFORCEMENT | LIABILITY | LIABILITY | | | [ ] 470 RACKETEER INFLU- |
| OF JUDGMENT | [ ] 340 MARINE | | | [ ] 820 COPYRIGHTS | ENCED & CORRUPT |
| [ ] 151 MEDICARE ACT | [ ] 345 MARINE PRODUCT | PERSONAL PROPERTY | | [ ] 830 PATENT | ORGANIZATION ACT |
| [ ] 152 RECOVERY OF | LIABILITY | | | [ ] 840 TRADEMARK | (RICO) |
| DEFAULTED | [ ] 350 MOTOR VEHICLE | [ ] 370 OTHER FRAUD | | | [ ] 480 CONSUMER CREDIT |
| STUDENT LOANS | [ ] 355 MOTOR VEHICLE | [ ] 371 TRUTH IN LENDING | | | [ ] 490 CABLE/SATELLITE TV |
| (EXCL VETERANS) | PRODUCT LIABILITY | | | SOCIAL SECURITY | |
| [ ] 153 RECOVERY OF | [ ] 360 OTHER PERSONAL | | | | [ ] 850 SECURITIES/ |
| OVERPAYMENT | INJURY | [ ] 380 OTHER PERSONAL | LABOR | [ ] 861 HIA (1395ff) | COMMODITIES/ |
| OF VETERAN'S | [ ] 362 PERSONAL INJURY - | PROPERTY DAMAGE | [ ] 710 FAIR LABOR | [ ] 862 BLACK LUNG (923) | EXCHANGE |
| BENEFITS | MED MALPRACTICE | [ ] 385 PROPERTY DAMAGE | STANDARDS ACT | [ ] 863 DIWC/DIWW (405(g)) | |
| [ ] 160 STOCKHOLDERS | | PRODUCT LIABILITY | [ ] 720 LABOR/MGMT | [ ] 864 SSID TITLE XVI | [ ] 890 OTHER STATUTORY |
| SUITS | | | RELATIONS | [ ] 865 RSI (405(g)) | ACTIONS |
| [ ] 190 OTHER | | PRISONER PETITIONS | [ ] 740 RAILWAY LABOR ACT | | [ ] 891 AGRICULTURAL ACTS |
| CONTRACT | | [ ] 463 ALIEN DETAINEE | [ ] 751 FAMILY MEDICAL | | |
| [ ] 195 CONTRACT | | [ ] 510 MOTIONS TO | LEAVE ACT (FMLA) | FEDERAL TAX SUITS | |
| PRODUCT | ACTIONS UNDER STATUTES | VACATE SENTENCE | | | [ ] 893 ENVIRONMENTAL |
| LIABILITY | | 28 USC 2255 | [ ] 790 OTHER LABOR | [ ] 870 TAXES (U.S. Plaintiff or | MATTERS |
| [ ] 196 FRANCHISE | CIVIL RIGHTS | [ ] 530 HABEAS CORPUS | LITIGATION | Defendant) | [ ] 895 FREEDOM OF |
| | | [ ] 535 DEATH PENALTY | [ ] 791 EMPL RET INC | [ ] 871 IRS-THIRD PARTY | INFORMATION ACT |
| | [ ] 440 OTHER CIVIL RIGHTS | [ ] 540 MANDAMUS & OTHER | SECURITY ACT | 26 USC 7609 | [ ] 896 ARBITRATION |
| REAL PROPERTY | (Non-Prisoner) | | | | [ ] 899 ADMINISTRATIVE |
| | [ ] 441 VOTING | | | | PROCEDURE ACT/REVIEW OR |
| [ ] 210 LAND | [ ] 442 EMPLOYMENT | PRISONER CIVIL RIGHTS | IMMIGRATION | | APPEAL OF AGENCY DECISION |
| CONDEMNATION | [ ] 443 HOUSING/ | | [ ] 462 NATURALIZATION | | [ ] 950 CONSTITUTIONALITY OF |
| [ ] 220 FORECLOSURE | ACCOMMODATIONS | [ ] 550 CIVIL RIGHTS | APPLICATION | | STATE STATUTES |
| [ ] 230 RENT LEASE & | [ ] 445 AMERICANS WITH | [ ] 555 PRISON CONDITION | [ ] 465 OTHER IMMIGRATION | | |
| EJECTMENT | DISABILITIES - | [ ] 560 CIVIL DETAINEE | ACTIONS | | |
| [ ] 240 TORTS TO LAND | EMPLOYMENT | CONDITIONS OF CONFINEMENT | | | |
| [ ] 245 TORT PRODUCT | [ ] 446 AMERICANS WITH | | | | |
| LIABILITY | DISABILITIES -OTHER | | | | |
| [ ] 290 ALL OTHER | [ ] 448 EDUCATION | | | | |
| REAL PROPERTY | | | | | |

Note: ☒ 710 FAIR LABOR STANDARDS ACT is checked under LABOR.

*Check if demanded in complaint:*

☑ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

4054010987A4

DEMAND $_____ OTHER _____

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.?
IF SO, STATE:

JUDGE _____   DOCKET NUMBER_____

*Check YES only if demanded in complaint*
JURY DEMAND: ☒ YES ☐ NO

NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32).

*(PLACE AN x IN ONE BOX ONLY)*                                    **ORIGIN**

[x] 1 Original        [ ] 2 Removed from      [ ] 3 Remanded      [ ] 4 Reinstated or    [ ] 5 Transferred from   [ ] 6 Multidistrict   [ ] 7 Appeal to District
     Proceeding              State Court              from                 Reopened              (Specify District)        Litigation              Judge from
                      [ ] a. all parties represented    Appellate                                                                                  Magistrate Judge
                                                   Court                                                                                       Judgment
                      [ ] b. At least one
                            party is pro se.

*(PLACE AN x IN ONE BOX ONLY)*                    **BASIS OF JURISDICTION**              ***IF DIVERSITY, INDICATE***
                                                                                        ***CITIZENSHIP BELOW.***
[ ] 1 U.S. PLAINTIFF    [ ] 2 U.S. DEFENDANT    [x] 3 FEDERAL QUESTION    [ ] 4 DIVERSITY
                                                      (U.S. NOT A PARTY)

**CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)**

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF DEF |  | PTF DEF |  | PTF DEF |
|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ]1 [ ]1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ]3 [ ]3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ]5 [ ]5 |
| CITIZEN OF ANOTHER STATE | [ ]2 [ ]2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ]4 [ ]4 | FOREIGN NATION | [ ]6 [ ]6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

Mohammed Nabi -32-15 30th Street, Apt A-35, Astoria, NY 11106 (Queens County)

Rifat Rizvi - 1544 W. 1st Street, Apt A-3, Brooklyn, NY 11204 (Kings County)

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

Hudson News Company - 1 Meadowlands Plaza, Suite 902, East Rutherford, NJ 07073
Hudson Group, LLC - 1 Meadowlands Plaza, Suite 902, East Rutherford, NJ 07073
Hudson Group (HG) Retail, LLC - 1 Meadowlands Plaza, Suite 902, East Rutherford, NJ 07073
Airport Management Services, LLC - 1 Meadowlands Plaza, Suite 902, East Rutherford, NJ 07073
(all Defendants Bergen County)

DEFENDANT(S) ADDRESS UNKNOWN
    REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN
RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:    THIS ACTION SHOULD BE ASSIGNED TO:    [ ] WHITE PLAINS    [x] MANHATTAN
              (DO NOT check either box if this a PRISONER PETITION/PRISONER CIVIL RIGHTS
              COMPLAINT.)

DATE 6-25-14   SIGNATURE OF ATTORNEY OF RECORD          ADMITTED TO PRACTICE IN THIS DISTRICT
                                                        [ ] NO
RECEIPT #                                               [x] YES (DATE ADMITTED Mo. 12____  Yr. 2008____)
                                                        Attorney Bar Code # CL 4086

                                            **MAG. JUDGE R. FOX**

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

JUDGE CAPRONI

# 14 CV 4635

LEE LITIGATION GROUP, PLLC
C.K. Lee (CK 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1188
Fax: 212-465-1181

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MOHAMMED NABI and RIFAT RIZVI,
*on behalf of themselves, FLSA Collective Plaintiffs*
*and Class members*,

        Plaintiffs,

        v.

HUDSON NEWS COMPANY, HUDSON
GROUP LLC, HUDSON GROUP (HG)
RETAIL, LLC, AIRPORT MANAGEMENT
SERVICES, LLC,
and JOHN DOES #1-10,

        Defendants.

Case No.:

**CLASS AND COLLECTIVE**
**ACTION COMPLAINT**

**Jury Trial Demanded**

Plaintiffs, MOHAMMED NABI and RIFAT RIZVI (hereinafter, "Plaintiffs"), on behalf of themselves and others similarly situated, by and through their undersigned attorneys, hereby file this Class and Collective Action Complaint against Defendants, HUDSON NEWS COMPANY, HUDSON GROUP LLC, HUDSON GROUP (HG) RETAIL, LLC, AIRPORT MANAGEMENT SERVICES, LLC, and JOHN DOES #1-10, (collectively, "Defendants") and state as follows:

## INTRODUCTION

1.      Plaintiffs allege, pursuant to the Fair Labor Standards Act, as amended, 29 U.S.C. §§201 *et. seq.* ("FLSA"), that they are entitled to recover from Defendants, among others: (1) unpaid overtime, (2) liquidated damages and statutory penalties, and (3) attorneys' fees and costs.

2.      Plaintiffs further allege that, pursuant to the New York Labor Law, they are entitled to recover from Defendants, among others: (1) unpaid overtime, (2) liquidated damages and statutory penalties and (3) attorneys' fees and costs.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this controversy pursuant to 29 U.S.C. §216(b), 28 U.S.C. §§1331, 1337 and 1343, and has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.  Original jurisdiction also exists over all claims in this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). This is a putative class action in which: (1) there are 100 or more members in the Plaintiffs' proposed class; (2) at least some members of the proposed class have a different citizenship from Defendants; and (3) the claims of the proposed class members exceed $5,000,000.00 in the aggregate.

4.      Venue is proper in the Southern District pursuant to 28 U.S.C. §1391.

## PARTIES

5.      Plaintiff MOHAMMED NABI is a resident of Queens County, New York.

6.      Plaintiff RIFAT RIZVI is a resident of Kings County, New York.

7.      Defendants HUDSON NEWS COMPANY, HUDSON GROUP, LLC, HUDSON GROUP (HG) RETAIL, LLC and AIRPORT MANAGEMENT SERVICES,

2

LLC (together with JOHN DOES #1-10 collectively the "Defendants") operate over 600 stores in over 70 locations across North America. These stores, located at airports and major commuter stations, include both "Hudson News" shops and shops of various retail brands operated together with "Hudson News" (e.g. Dunkin Donuts, etc.).

8.     Defendant, HUDSON NEWS COMPANY, is a New Jersey corporation which operates a business in New York County, and has its principal place of business at 1 Meadowlands Plaza, Suite 902, East Rutherford, NJ 07073.

9.     Defendant, HUDSON GROUP, LLC is a New Jersey limited liability company which operates a business in New York County, and has its principal place of business at 1 Meadowlands Plaza, Suite 902, East Rutherford, NJ 07073. Upon information and belief, Defendant HUDSON GROUP, LLC is a wholly owned subsidiary of Dufry, AG.

10.     Defendant, HUDSON GROUP (HG) RETAIL, LLC is a Delaware limited liability company which operates a business in New York County, and has its principal place of business at 1 Meadowlands Plaza, Suite 902, East Rutherford, NJ 07073.

11.     Defendant, AIRPORT MANAGEMENT SERVICES, LLC is a Delaware limited liability company which operates a business in New York County and has its principal place of business at 1 Meadowlands Plaza, Suite 902, East Rutherford, NJ 07073.

12.     Upon information and belief, Defendants JOHN DOES #1-10 constitute other entities that employed Plaintiffs and/or represent the officers, directors and/or managing agents of the corporate defendants, whose identities are unknown at this time and who participated in the day-to-day operations of the corporate defendants and are

"employers" pursuant to the FLSA, 29 U.S.C. § 203(d), 29 C.F.R. § 791.2 and New York Labor Law, and are jointly and severally liable together with the corporate defendants.

13.     The Defendants operate as a single integrated enterprise. All of the Defendants operate out of the central business operations office located at 1 MEADOWLANDS PLAZA, SUITE 902, EAST RUTHERFORD, NJ 07073.

14.     At all relevant times, each of the corporate defendants was and continues to be an "enterprise engaged in commerce" within the meaning of the FLSA.

15.     At all relevant times, the work performed by Plaintiffs was directly essential to the business operated by Defendants.

16.     Plaintiffs have fulfilled all conditions precedent to the institution of this action and/or such conditions have been waived.

<div align="center">

**FLSA COLLECTIVE ACTION ALLEGATIONS**

</div>

17.     Plaintiffs bring claims for Relief as a collective action pursuant to 29 U.S.C. § 216(b) on behalf of all non-exempt employees employed by Defendants at Hudson News Newsstands throughout the United States on or after the date that is six years before the filing of the Complaint in this case as defined herein ("FLSA Nationwide Collective Plaintiffs").

18.     At all relevant times, Plaintiffs and the other FLSA Nationwide Collective Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans and common policies, programs, practices, procedures, protocols, routines, and rules willfully failing and refusing to pay them (i) overtime hours at the rate of one and one half for hours worked in excess of forty (40) hours per

workweek and (ii) improperly classifying non-exempt employees as exempt. The claims of Plaintiffs stated herein are essentially the same as those of the other FLSA Nationwide Collective Plaintiffs.

19.     The claims for Relief are properly brought under and maintained as an opt-in collective action pursuant to 29 U.S.C. 216(b). The FLSA Nationwide Collective Plaintiffs are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from the Defendants. Notice can be provided to the FLSA Nationwide Collective Plaintiffs via first class mail to the last address known to Defendants.

**RULE 23 CLASS ALLEGATIONS**

20.     Plaintiffs bring claims for Relief pursuant to the Federal Rules of Civil Procedure ("F.R.C.P.") Rule 23, on behalf of all non-exempt employees employed by Defendants at Hudson News Newsstands throughout the United States ("Class members") on or after the date that is six years before the filing of the Complaint in this case as defined herein (the "Class Period"). Non-exempt employees in the Class include employees similar to Plaintiffs who had "managerial" titles (including but not limited to, "Manager", "Operations Manager", or similar titles) and performed primarily non-exempt duties including stocking the store, merchandising, guarding, cashiering, assisting customers and moving newspapers.

21.     All said persons, including Plaintiffs, are referred to herein as the "Class." The class members are readily ascertainable.  The number and identity of the Class members are determinable from the records of Defendants. The hours assigned and worked, the position held, and rates of pay (including commission compensation) for

each Class member are also determinable from Defendants' records. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided, as permissible under F.R.C.P. 23.

22.     The proposed Class is so numerous that joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. Although the precise number of such persons is unknown, the facts on which the calculation of that number are presently within the sole control of Defendants, there is no doubt that there are more than forty (40) members of the Class.

23.     Plaintiffs' claims are typical of those claims, which could be alleged by any member of the Class, and the relief sought is typical of the relief, which would be sought by each member of the Class in separate actions. All the Class members were subject to the same corporate practices of Defendants, as alleged herein, of failing to pay (i) overtime compensation and (ii) improperly classifying non-exempt employees as exempt. Defendants' corporate-wide policies and practices affected all Class members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class member. Plaintiffs and other Class members sustained similar losses, injuries and damages arising from the same unlawful policies, practices and procedures.

24.     Plaintiffs are able to fairly and adequately protect the interests of the Class and have no interests antagonistic to the Class. Plaintiffs are represented by attorneys who are experienced and competent in both class action litigation and employment litigation and have previously represented plaintiffs in wage and hour cases.

25.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of the wage and

hour litigation where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants. Class action treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender. Because of losses, injuries and damages suffered by each of the individual Class members are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in a significant saving of these costs. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

26.     Defendants and other employers throughout the United States violate state labor laws. Current employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure

employment. Class actions provide class members who are not named in the complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

27.     There are questions of law and fact common to the Class that predominate over any questions affecting only individual class members, including:

a) Whether Defendants employed Plaintiffs and the Class members within the meaning of the New York law;

b) What are and were the policies, practices, programs, procedures, protocols and plans of Defendants regarding the types of work and labor for which Defendants did not pay the Class members;

c) At what common rate, or rates subject to common methods of calculation, was and are Defendants required to pay the Class members for their work;

d) Whether Defendants properly paid Plaintiffs and Class members for overtime;

e) Whether the Defendants misclassified the members of the Class as exempt from overtime;

f) Whether the Defendants provided to Plaintiffs and Class members proper wage and hour notice, at date of hiring and annually, to all non-exempt employees per requirements of the New York Labor Law; and

g)  Whether the Defendants provided to Plaintiffs and Class members proper wage statements with each payment of wages as required by New York Labor Law;

8

## STATEMENT OF FACTS

28.     Defendants operate over 600 stores in 70 plus operations across North America, with an assortment of close to 100 different retail brands.   Defendants operations are located in airports and daily commuter stations across the country.

29.     At its airport operations, Defendants partner with over 60 different joint venture entities in accordance with the guidelines of the Federal Airport Concessions Disadvantaged Business Enterprises ("ACDBE") program, which requires that Hudson News operate joint ventures with local Disadvantaged Business Enterprises ("DBE") to conduct business at each of the nation's airports.   Defendants operate the "Hudson News" retail stores as well as proprietary retail theme stores, specialty retail stores, national retail stores and regional retailers.

30.     Defendants' commuter station operations consist almost exclusively of "Hudson News" newsstand stores.   Each of the Plaintiffs were employed at Defendants' "Hudson News" newsstand stores in commuter stations.

31.     Plaintiff MOHAMMED NABI worked for Defendants as a newspaper stand worker from in or about September 1991 to May 12, 2013 in each of Defendants' six (6) Grand Central Station locations.

32.     In or about 1998, Plaintiff MOHAMMED NABI was given the title "supervisor".   In or about 2005, Plaintiff MOHAMMED NABI was give the title "manager".   However, at all times during his employment, Plaintiff MOHAMMED NABI, did not have any managerial duties.   Plaintiff, MOHAMMED NABI, reported to an Assistant General Manager who in turn reported to a General Manager, Bob Khan, now deceased.

33.     During his employment with Defendants, Plaintiff, MOHAMMED NABI, delivered and collected newspapers, worked a cash register, watched customers to prevent theft, stocked shelves and assisted customers to find merchandise.

34.     From the beginning of his employment until 2011, Plaintiff MOHAMMED NABI worked from 2:30 P.M. to 1:30 A.M., without any breaks, for 6 days per week. He was paid a fixed weekly salary of $760 per week. In 2010 Plaintiff's fixed weekly salary was raised to $780 per week.

35.     From 2001 to his termination on May 12, 2013, Plaintiff MOHAMMED NABI worked from 2:30 P.M. to 1:30 A.M., without any breaks, for 5 days per week.

36.     Plaintiff, MOHAMMED NABI, never received any notice informing him that the fixed salary covered overtime hours.

37.     During his employment, Defendants did not pay Plaintiff MOHAMMED NABI time and one half for his hours worked over 40 hours per week.

38.     Plaintiff, MOHAMMED NABI, worked on average with at least 10 other newsstand co-workers with the title of "manager".

39.     During his employment with Defendants, Plaintiff, MOHAMMED NABI's duties as a newsstand worker did not include managerial responsibilities or the exercise of independent business judgment. His responsibilities did not include the power to hire and fire, scheduling and or any supervisory duties.

40.     Plaintiff RIFAT RIZVI worked for Defendants as a newspaper stand worker from on or about June 13, 2003 to in or about 2009 in Defendants' Penn Station location and from in or about 2009 to September 7, 2012 in each of the six (6) Grand Central Station locations.

41.     In or about January 2004, Plaintiff RIFAT RIZVI was given the title "operations manager". However, at all times during her employment, Plaintiff RIFAT RIZVI, did not have any managerial duties. Plaintiff, RIFAT RIZVI, reported to an Assistant General Manager who in turn reported to a General Manager.

42.     During her employment with Defendants, Plaintiff, RIFAT RIZVI, delivered and collected newspapers, worked a cash register, watched customers to prevent theft, stocked shelves and assisted customers to find merchandise.

43.     From the beginning of her employment until 2007, Plaintiff RIFAT RIZVI had the following schedule: From 2003 to 2009 (at Penn Station) she worked 6 days per week, from 5:30 A.M. to 4:00 P.M; from 2009 to 2011 (at Grand Central Station), she worked 6 days per week from 5:30 A.M. to 3:30 P.M.; beginning in 2012 until her termination, she worked 5 days per week from 5:30 A.M. to 4:30 P.M.

44.     Plaintiff, RIFAT RIZVI was paid a fixed weekly salary of $715 per week during her entire employment period.

45.     Plaintiff, RIFAT RIZVI, never received any notice informing her that the fixed salary covered overtime hours.

46.     During her employment, Defendants did not pay Plaintiff RIFAT RIZVI time and one half for her hours worked over 40 hours per week.

47.     Plaintiff, RIFAT RIZVI, worked on average with at least 20 other newsstand workers with the title of "manager".

48.     During her employment with Defendants, Plaintiff RIFAT RIZVI's duties as a newsstand worker did not include managerial responsibilities or the exercise of

11

independent business judgment.  Her responsibilities did not include the power to hire and fire, scheduling and or any supervisory duties.

49.    Defendants misclassified Plaintiffs MOHAMMED NABI and RIFAT RIZVI, FLSA Nationwide Collective Plaintiffs and Class members because they were not managerial and not exempt under the executive exemption of the FLSA.

50.    Plaintiffs, FLSA Nationwide Collective Plaintiffs and Class members were improperly paid a fixed weekly salary.  None of the Plaintiffs, FLSA Nationwide Collective and Class members were ever notified that the fixed salary paid to them covered their overtime hours.  Their paystubs state that they are paid a fixed salary for 40 hours worked, without any indication of overtime hours worked.  All overtime hours were unpaid.

51.    Defendants cannot rely on the executive exemption of the FLSA, which states that employers do not have to pay time and a half to any individual "employed in a bona fide executive, administrative or professional capacity." See 29 U.S.C. Section 213(a)(1). Under Department of Labor regulations, the 'bona fide executive" exemption applies only to an employee: (1) compensated on a salary basis at a rate of not less than $455 per week...; (2) whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) who customarily and regularly directs the work of two or more other employees; and (4) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement promotion or any other change of status of other employees are given particular weight. 29 C.F.R. Section 541.100(a). Based on Plaintiffs' observations, neither they, nor any other employees misclassified as

"managers" ever met the requirements of the executive exemption. Defendants violated the FLSA by improperly classifying Plaintiffs and Class members as exempt executive employees.

52.     Defendants records will demonstrate that Plaintiffs, FLSA Nationwide Collective Plaintiffs and other Class members were improperly paid on a fixed salary basis and were not properly paid overtime of time and one half for hours worked over 40 in a workweek. Such policy was implemented nation-wide by Defendants.

53.     All non-exempt employees of Defendants were improperly paid on a fixed salary basis and were not paid overtime of time and one half for hours worked over 40 in a workweek, in violation of the New York Labor Law and the labor law of other states. Such policy was implemented nation-wide by Defendants.

54.     Defendants knowingly and willfully operated their business with a policy of not paying either the FLSA overtime rate (of time and one-half) or the New York State overtime rate (of time and one-half) to the Plaintiffs, FLSA Nationwide Collective Plaintiffs, and Class members by improperly misclassifying them as exempt.

55.     Plaintiffs retained Lee Litigation Group, PLLC to represent them and other employees similarly situated in this litigation and have agreed to pay the firm a reasonable fee for their services.

<div align="center">

**STATEMENT OF CLAIM**

**COUNT I**

**VIOLATION OF THE FAIR LABOR STANDARDS ACT**

</div>

56.     Plaintiffs reallege and reaver Paragraphs 1 through 55 of this Class and Collective Action Complaint as if fully set forth herein.

57.     At all relevant times, Defendants were and continue to be employers engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207 (a). Further, Plaintiffs and FLSA Nationwide Collective Plaintiffs are covered individuals within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207 (a).

58.     At all relevant times, Defendants employed Plaintiffs and FLSA Nationwide Collective Plaintiffs within the meaning of the FLSA.

59.     At all relevant times, each Defendant had gross revenues in excess of $500,000.

60.     At all relevant times, the Defendants had a policy and practice of refusing to pay overtime compensation at the statutory rate of time and one-half to Plaintiffs and FLSA Nationwide Collective Plaintiffs for their hours worked in excess of forty hours per workweek.

61.     Defendants failed to pay Plaintiffs and FLSA Nationwide Collective Plaintiffs overtime compensation in the lawful amount for hours worked in excess of the maximum hours provided for in the FLSA.

62.     Records, if any, concerning the number of hours worked by Plaintiffs and FLSA Nationwide Collective Plaintiffs and the actual compensation paid to Plaintiffs and FLSA Nationwide Collective Plaintiffs are in the possession and custody of the Defendants. Plaintiffs and FLSA Nationwide Collective Plaintiffs intend to obtain these records by appropriate discovery proceedings to be taken promptly in this case and, if necessary, will then seek leave of Court to amend this Class and Collective Action Complaint to set forth the precise amount due.

63.     Defendants knew of and/or showed a willful disregard for the provisions of the FLSA as evidenced by their failure to compensate Plaintiffs at the statutory rate of time and one-half for their hours worked in excess of forty (40) hours per week when Defendants knew or should have known such was due.

64.     Defendants failed to properly disclose or apprise Plaintiffs and FLSA Nationwide Collective Plaintiffs of their rights under the FLSA.

65.     As a direct and proximate result of Defendants' willful disregard of the FLSA, Plaintiffs and FLSA Nationwide Collective Plaintiffs are entitled to liquidated damages pursuant to the FLSA.

66.     Due to the intentional, willful and unlawful acts of Defendants, Plaintiffs and the FLSA Nationwide Collective Plaintiffs suffered damages in an amount not presently ascertainable of unpaid overtime wages, plus an equal amount as liquidated damages.

67.     Plaintiffs and FLSA Nationwide Collective Plaintiffs are entitled to an award of their reasonable attorneys' fees and costs pursuant to 29 U.S.C. §216(b).

## COUNT II

## VIOLATION OF NEW YORK LABOR LAW

68.     Plaintiffs reallege and reaver Paragraphs 1 through 67 of this Class and Collective Action Complaint as if fully set forth herein.

69.     At all relevant times, Plaintiffs and members of the New York Class were employed by the Defendants within the meaning of New York Labor Law, §§ 2 and 651.

70.     Defendants willfully violated Plaintiffs' and New York Class members' rights by failing to pay Plaintiffs and New York Class members overtime compensation

at rates not less than one and one-half times the regular rate of pay for each hour worked in excess of forty hours in a workweek.

71.     Defendants failed to provide a proper wage and hour notice, at the date of hiring and annually, to all non-exempt employees per requirements of the New York Labor Law.

72.     Defendants failed to provide proper wage statements with every payment as required by New York Lab. Law § 195(3).

73.     Defendants willfully violated Plaintiffs and New York Class members' rights by failing to pay Plaintiffs (i) overtime, and (ii) statutory penalties for failing to provide proper wage statements and notices as required under applicable state law.

74.     Due to the Defendants' New York Labor Law violations, Plaintiffs and Class members are entitled to recover from Defendants their (i) overtime, (ii) statutory penalties, (iii) reasonable attorneys' fees, (vi) liquidated damages, and (vii) costs and disbursements of the action.

## COUNT III

## VIOLATION OF APPLICABLE STATE LAWS

75. Plaintiffs reallege and reaver Paragraphs 1 through 74 of this Class and Collective Action Complaint as if fully set forth herein.

76. At all relevant times, Plaintiffs and members of the Class were employed by the Defendants within the meaning of the applicable state wage and hour laws.

77.     Defendants willfully violated Plaintiffs' and Class members' rights by failing to pay Plaintiffs and Class members overtime compensation at rates not less than

one and one-half times the regular rate of pay for each hour worked in excess of forty hours in a workweek.

78.     Defendants willfully violated Class members' rights by failing to provide proper wage statements and notices as required under the applicable state wage and hour laws.

79.     Defendants willfully violated Plaintiffs and Class members' rights by failing to pay (i) overtime, and (ii) statutory penalties for failing to provide proper wage statements and notices as required under applicable state laws.

80. Due to the state law violations effected by the Defendants, Class members are entitled to recover from the Defendants their (i) overtime, (ii) statutory penalties, (iii) liquidated damages, and (iv) costs and disbursements of the action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of themselves and all similarly situated employees, respectfully request that this Court grant the following relief:

a.      A declaratory judgment that the practices complained of herein are unlawful under the FLSA and the applicable state law;

b.      An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

c.      An award of unpaid overtime compensation due under the FLSA and the applicable state laws;

d.      An award of statutory penalties as a result of Defendants' failure to comply with New York Labor Law wage notice and wage statement requirements;

e.      An award of liquidated and/or punitive damages as a result of Defendants' willful failure to pay overtime compensation, pursuant to 29 U.S.C. § 216;

f.      An award of liquidated and/or punitive damages as a result of Defendants' willful failure to pay overtime compensation, pursuant to the applicable state law;

g.      An award of relevant statutory penalties, including prejudgment and postjudgment interest;

h.      An award of costs and expenses of this action together with reasonable attorneys' and expert fees;

j.      Designation of Plaintiffs as Representatives of the FLSA Nationwide Collective Plaintiffs;

k.      Designation of this action as a class action pursuant to F.R.C.P. 23;

l.      Designation of Plaintiffs as Representatives of the New York Class; and

m.      Designation of Plaintiffs as Representatives of the Class; and

n.      Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury on all issues so triable as of right by jury.

Dated: June **25**, 2014

Respectfully submitted,

LEE LITIGATION GROUP, PLLC
C.K. Lee (CL 4086)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1188
Fax: 212-465-1181

By: _____
C.K. Lee (CL 4086)

*Attorneys for Plaintiffs, FLSA Collective Plaintiffs and Class members*

# EXHIBIT 6

CO     FILE #        CLOCK VCHR. NO.
HGD    102414            0190001620
                            000540
AIRPORT MANAGEMENT SERVICES, LLC
1 MEADOWLANDS   PLAZA

EAST RUTHERFORD,   NJ 07073

MOHAMMAD NUR NABI
32-15  30 STREET APT.A35

ASTORIA NY 111060000

**PLEASE SIGN, DATE AND KEEP A COPY FOR YOUR RECORDS
RETURN THE SIGNED FORM TO YOUR MANAGER**



Notice and Acknowledgement of Pay Rate and Payday
Under Section 195.1 of the New York State Labor Law
Notice for Exempt Employees

### 1. Employer Information

Name:

AIRPORT MANAGEMENT SERVICES, L

Doing Business As (DBA) Name(s):

HUDSON NEWS

FEIN (optional):

Physical Address:
1 MEADOWLANDS   PLAZA

EAST RUTHERFORD,   NJ 07073

Mailing Address:

1 MEADOWLANDS   PLAZA

EAST RUTHERFORD,   NJ 07073

Phone: 201 939 5050

### 2. Notice given:
☐ At hiring
☒ On or before February 1
☐ Before a change in pay rate(s),
   allowances claimed, or payday

LS 59 (03/11)

**3. Employee's pay rate(s): State if pay is based
on an hourly, salary, day rate, piece rate, or
other basis.**
      803.40    SALARY

Employers may not pay a non-hourly rate to a
non-exempt employee in the Hospitality
Industry, except for commissioned salespeople.

**4. Allowances taken:**
☒ None
☐ Tips _____ per hour
☐ Meals _____ per meal
☐ Lodging _____
☐ Other _____

**5. Regular payday:** FRIDAY

**6. Pay is:**
☒ Weekly
☐ Bi-weekly
☐ Other: _____

**7. Overtime Pay Rate:**
Most workers in NYS must receive at least 1½
times their regular rate of pay for all hours
worked over 40 in a workweek, with few
exceptions. A limited number of employees
must only be paid overtime at 1½ times the
minimum wage rate, or not at all.

This employee is exempt from overtime under
the following exemption (optional): _____

**8. Employee Acknowledgement:**
On this day, I received notice of my pay rate,
overtime rate (if eligible), allowances, and
designated payday. I told my employer what
my primary language is.

Check one:
☐ I have been given this pay notice in English
because it is my primary language.

☐ My primary language is _____
have been given this pay notice in English only,
because the Department of Labor does not yet
offer a pay notice form in my primary language.

MOHAMMAD NUR NABI
Print Employee Name

*MOHAMMAD NABI*
Employee Signature

*Mohammad Nabi*
Date   01-26-12

FEHMI MALIK
V.P. OF EMPLOYEE RELATIONS & HRIS
Preparer Name and Title

The employee must receive a signed copy of
this form. The employer must keep the original
for 6 years.



EXHIBIT
NABI-7
10-7-14

HUD01293

```
CO      FILE #    CLOCK VCHR. NO.
HGD     102414           0170002364
                              000788
AIRPORT   MANAGEMENT   SERVICES,   LLC
1 MEADOWLANDS   PLAZA

EAST RUTHERFORD,   NJ 07073
```

MOHAMMAD NUR NABI
32-15 30 STREET APT. A35

ASTORIA NY 111060000

PLEASE SIGN, DATE AND KEEP A COPY FOR YOUR RECORDS RETURN THE SIGNED FORM TO YOUR MANAGER



**Notice and Acknowledgement of Pay Rate and Payday**
**Under Section 195.1 of the New York State Labor Law**
**Notice for Exempt Employees**

**1. Employer Information**

Name:

AIRPORT  MANAGEMENT   SERVICES,  L

Doing Business As (DBA) Name(s):

HUDSON  NEWS

FEIN (optional):
55-0846816

Physical Address:
1 MEADOWLANDS   PLAZA

EAST RUTHERFORD,   NJ 07073

Mailing Address:
1 MEADOWLANDS   PLAZA

EAST RUTHERFORD,   NJ 07073

Phone: 201 939 5050

**2. Notice given:**
☐ At hiring
☒ On or before February 1
☐ Before a change in pay rate(s),
    allowances claimed, or payday

LS 59 (03/11)

**3. Employee's pay rate(s): State if pay is based**
on an hourly, salary, day rate, piece rate, or
other basis.
803.40     SALARY

Employers may not pay a non-hourly rate to a
non-exempt employee in the Hospitality
Industry, except for commissioned salespeople.

**4. Allowances taken:**
☒ None
☐ Tips _____ per hour
☐ Meals _____ per meal
☐ Lodging _____
☐ Other _____

**5. Regular payday:** FRIDAY

**6. Pay is:**
☒ Weekly
☐ Bi-weekly
☐ Other: _____

**7. Overtime Pay Rate:**
Most workers in NYS must receive at least 1½
times their regular rate of pay for all hours
worked over 40 in a workweek, with few
exceptions. A limited number of employees
must only be paid overtime at 1½ times the
minimum wage rate, or not at all.

This employee is exempt from overtime under
the following exemption (optional): _____

**8. Employee Acknowledgement:**
On this day, I received notice of my pay rate,
overtime rate (if eligible), allowances, and
designated payday. I told my employer what
my primary language is.

**Check one:**
☐ I have been given this pay notice in English
because it is my primary language.

☐ My primary language is _____. I
have been given this pay notice in English only,
because the Department of Labor does not yet
offer a pay notice form in my primary language.

MOHAMMAD  NUR NABI
Print Employee Name

*Mohammad Nabi*
Employee Signature

*Mohammad Nabi*
Date      01 – 2 6 – 13

FEHMI  MALIK
V.P. OF EMPLOYEE  RELATIONS  & HRIS
Preparer Name and Title

The employee must receive a signed copy of
this form. The employer must keep the original
for 6 years.

CO      FILE #     CLOCK VCHR. NO.
HGD     102363        0190001959
                         000653
*AIRPORT  MANAGEMENT  SERVICES,  LLC*
*1 MEADOWLANDS   PLAZA*

*EAST  RUTHERFORD,   NJ 07073*

**RIFAT RIZVI
1544 WEST 1ST STREET
APT A-3
BROOKLYN NY 11204**

**PLEASE  SIGN,  DATE  AND  KEEP  A  COPY  FOR  YOUR  RECORDS
RETURN  THE  SIGNED  FORM  TO  YOUR  MANAGER**



**Notice and Acknowledgement of Pay Rate and Payday
Under Section 195.1 of the New York State Labor Law
Notice for Exempt Employees**

**1.  Employer Information**

Name:

AIRPORT  MANAGEMENT   SERVICES,  L

Doing Business As (DBA) Name(s):

HUDSON  NEWS

FEIN (optional):

Physical Address:
1 MEADOWLANDS   PLAZA

EAST  RUTHERFORD,   NJ 07073

Mailing Address:
1 MEADOWLANDS   PLAZA

EAST  RUTHERFORD,   NJ 07073

Phone:  201 939 5050

**2. Notice given:**
☐ At hiring
☒ On or before February 1
☐ Before a change in pay rate(s),
    allowances claimed, or payday

LS 59 (03/11)

**3. Employee's pay rate(s): State if pay is based
on an hourly, salary, day rate, piece rate, or
other basis.**
_____715.00_____SALARY_____

Employers may not pay a non-hourly rate to a
non-exempt employee in the Hospitality
Industry, except for commissioned salespeople.

**4. Allowances taken:**
☒ None
☐ Tips _____ per hour
☐ Meals _____ per meal
☐ Lodging _____
☐ Other: _____

**5. Regular payday:**  FRIDAY

**6. Pay is:**
☒ Weekly
☐ Bi-weekly
☐ Other: _____

**7. Overtime Pay Rate:**
Most workers in NYS must receive at least 1½
times their regular rate of pay for all hours
worked over 40 in a workweek, with few
exceptions. A limited number of employees
must only be paid overtime at 1¼ times the
minimum wage rate, or not at all.

This employee is exempt from overtime under
the following exemption (optional): _____

_____

**8. Employee Acknowledgement:**
On this day, I received notice of my pay rate,
overtime rate (if eligible), allowances, and
designated payday.  I told my employer what
my primary language is.

**Check one:**
☐ I have been given this pay notice in English
because it is my primary language.

☐ My primary language is _____. I
have been given this pay notice in English only,
because the Department of Labor does not yet
offer a pay notice form in my primary language.

RIFAT RIZVI
Print Employee Name

Employee Signature

01/26/2012
Date

FEHMI MALIK
V.P. OF EMPLOYEE  RELATIONS  & HRIS
Preparer Name and Title

The employee must receive a signed copy of
this form. The employer must keep the original
for 6 years.


Δ π EXHIBIT  3
Deponent  RIZVI
Date  10/9/14  Rptr. SP
WWW.DEPOBOOK.COM

HUD01379

# EXHIBIT 7

1  DLA PIPER LLP (US)
   1251 Avenue of the Americas
2  New York, New York  10020
   Tel.:   (212) 335-4500
3  Fax:   (212) 335-4501
   *Counsel for Defendants Hudson Group (HG) Retail, LLC*
4  *and Airport Management Services, LLC*

5  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
6  ------------------------------------------------------ X
   MOHAMMED NABI and RIFAT RIZVI,                      :
7  *on behalf of themselves, FLSA Collective*            :
   *Plaintiffs and the Class,*                          :
8                                                       :
                                    Plaintiffs,         :        Case No.  14 CIV 4635 (VEC)
9                                                       :
                     -against-                          :        ECF Case
10                                                      :
   HUDSON GROUP (HG) RETAIL, LLC,                       :
11 AIRPORT MANAGEMENT                                   :
   SERVICES, LLC and JOHN DOES 1-10,                    :
12                                                      :
                                    Defendants.         :
13 ------------------------------------------------------ X

14              **DECLARATION OF SULTANA AHMED**

15     I, Sultana Ahmed, declare as follows:

16     1.  I have personal knowledge of the facts set forth in this Declaration and, if called as a

17         witness, could and would testify competently as to their accuracy.

18     2.  I currently work as an Office Manager at Hudson's Grand Central Station operations in

19         New York, New York.

20     3.  I was hired as a cashier at Hudson's Grand Central Station operations in August 1992.

21         Within three months, I was promoted to a salaried supervisor position.  I was then

22         promoted to Office Manager in 1994 at Hudson's Grand Central Station offices.

23     4.  I have a bachelor's degree from Sylhet Women's College in Bangladesh.

24     5.  Since I began work as a Hudson Manager, I have received a weekly salary which exceeds

25         $455 per week.  I have not experienced any deductions in salary for partial-day absences.

26         My salary is not reduced for variations in the quality or quantity of my work.

27

28                                            -1-

DLA PIPER LLP
   (US)
  NEW YORK

EAST\89006857.1

6.  The General Manager's Office is located at 420 Lexington, an office building inside of Grand Central Station.  This is also where the cash room and bookkeeping operations are located.

7.  As Office Manager, I generally work inside the General Manager's Office at Grand Central and not on the retail location floors.

8.  Hudson's Grand Central Station operations consist of five (5) retail locations.  Two (2) retail locations are located within Grand Central, open seven days a week during both the day and the evening.  The other three (3) locations are in office buildings located at 335 Madison Avenue; The Biltmore and 347 Madison Avenue and are open weekdays during both the day and night.

9.  Notices addressing employees' FLSA and overtime compensation rights are clearly and prominently posted on the employee poster board located in the employee locker room.

10. I check into work using the Kronos system, which is an electronic thumbprint identification system.  I do not clock or stamp out of work when I leave the facility.

11. As Office Manager, my duties include receiving invoices; accepting money for deposits; handling accounts receivables and accounts payables; handling payroll; assisting with new hires; processing new hire paperwork; processing immigration paperwork, including I-9's; coordinating drug testing; Lotto reconciliation; and more.

12. As an Office Manager, I generally do not conduct Operations Manager duties.  For example, I handle accounts payable and accounts receivable matters; utilize accounting skills daily; prepare deposit logs for corporate; prepare cashier over and shortage reports; prepare weekly reports for corporate; handle general office work, including phone calls, letters, faxes and filing; data entry; payroll processing; manage relationships and communications with the landlord; review and retrieve Z-readings and credit card audits; enter Z-reading information into spreadsheets; have responsibility for completing and verifying accuracy of sales reports; compile and report daily sales figures for the Regional Vice President, Terry Lent, the Hudson corporate office, Doug Martino, and the General Manager, Cathy Fisher; prepare daily reports to distribute to Hudson partners; have

1    responsibility for Dunbar orders; and more.  These are duties that Operations Managers do

2    not engage in, especially on the selling floor.

3

4    I declare under penalty of perjury under the laws of the State of New York and the United States

5    of America that the foregoing is true and correct and that this declaration was executed this 29

6    day of DECEMBER 2014 at New York, New York.

7

8                                          _S. Ahmed_____

9                                          SULTANA AHMED

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



## Position: Office Manager (Operations)

- Responsible for accurately counting daily deposits
- Reviews and retrieve Z-readings and credit card audits. Separating all reading by district and register number
- Entering Z-reading information into spreadsheets. Responsible for completing and verifying accuracy of sales report
- Report current day, last year and last week sale figures to Regional VP daily
- Prepares daily reports to distribute to Partners
- Responsible for Dunbar orders
- Accounts payable and accounts receivable duties as required
  Basic accounting skills
  Ten Key by touch
- Verify that the safe has been counted and balanced at the beginning and end of day
- Preparing daily deposit log and communicating with corporate
- Responsible for counting and balancing cigarettes twice a day
- Pulling cigarette orders daily. Responsible for receiving cigarettes from Warehouse. Relay cigarette inventory needs to Warehouse every Wednesday and Sunday
- Preparing cashier over and shortage report
- Responsible for preparing weekly reports for corporate
- Responsible for all supply orders for Cash office
- Completion of daily counts for cigarettes, water, phone cards, watches and sunglasses/readers
- Responsible for daily perpetual
- General office work, including phone calls, letters, faxes and filing.
- Data Entry.
- Computer proficiency, including Word, Excel and Outlook.
- Payroll experience.
- Ensuring paperwork is done properly and accurately.
- Ordering of store supplies.
- Cash Register experience.
- Assist with register operation during peak times or when short staffed and giving breaks.
- Flexible to work periodic long and/or irregular hours including early mornings, weekends and holidays.
- Inventory control.
- Provide excellent customer service to our traveling public.
- Maintaining open and positive communication with the landlord or Airport Management.

### Knowledge, Skill and Ability:

- Knowledge in counting large volumes of cash
- Microsoft Excel experience required
- Ability to have a flexible work schedule
- Skill in organization and computer
- Basic accounting skills
- Excellent communication skills
- Able to work well under pressure, be Punctual, and a Flexible Team Player

*SAhmed*
*12·31·2014*

# EXHIBIT 8

1    DLA PIPER LLP (US)
     1251 Avenue of the Americas
2    New York, New York  10020
     Tel.:   (212) 335-4500
3    Fax:    (212) 335-4501
     *Counsel for Defendants Hudson Group (HG) Retail, LLC*
4    *and Airport Management Services, LLC*

5    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
6    ------------------------------------------------------  X
     MOHAMMED NABI and RIFAT RIZVI,               :
7    *on behalf of themselves, FLSA Collective*        :
     *Plaintiffs and the Class,*                              :
8                                                                    :
                                        Plaintiffs,       :        Case No.  14 CIV 4635 (VEC)
9                                                                    :
                      -against-                              :        ECF Case
10                                                                  :
     HUDSON GROUP (HG) RETAIL, LLC,       :
11   AIRPORT MANAGEMENT                         :
     SERVICES, LLC and JOHN DOES 1-10,      :
12                                                                  :
                                        Defendants.    :
13   ------------------------------------------------------  X

14                          **DECLARATION OF DAISY BEGUM**

15          I, Daisy Begum, declare as follows:

16   1.  I have personal knowledge of the facts set forth in this Declaration and, if called as a

17        witness, could and would testify competently as to their accuracy.

18   2.  I currently work as an Office Manager at Hudson's Grand Central Station operations in

19        New York, New York.

20   3.  I was hired as a cashier at Hudson's Grand Central Station operations on June 14, 2004.

21        In 2005-2006 I was promoted to a salaried Floor Manager position.  In 2009, I was again

22        promoted, this time to Office Manager/Bookkeeper in the Hudson offices at Grand Central

23        Station.

24   4.  Since I began work as a Hudson Manager, I have received a weekly salary which exceeds

25        $455 per week.  I have not experienced any deductions in salary for partial-day absences.

26        My salary is not reduced for variations in the quality or quantity of my work.

27   5.  As Office Manager, I generally work inside the Hudson offices at Grand Central and not

28        on the retail location floors.  The General Manager's Office is located at 420 Lexington,

DLA PIPER LLP
     (US)
   NEW YORK

EAST\89006362.1
                                        DECLARATION OF DAISY BEGUM

1    an office building inside of Grand Central Station.  This is also where the cash room and

2    bookkeeping operations are located.

3    6.  I check into work using the Kronos system, which is an electronic thumbprint

4    identification system.  I do not clock or stamp out of work when I leave the facility.

5    7.  Hudson's Grand Central Station operations consist of five (5) retail locations.  Two (2)

6    retail locations are located within Grand Central, open seven days a week during both the

7    day and the evening.  The other three (3) locations are in office buildings located at 335

8    Madison Avenue; The Biltmore and 347 Madison Avenue and are open weekdays during

9    both the day and night.

10    8.  Notices addressing employees' FLSA and overtime compensation rights are clearly and

11    prominently posted on the employee poster board located in the employee locker room.

12    9.  My bookkeeping duties include receiving invoices; accepting money for deposits;

13    handling accounts receivables and accounts payables; handling payroll; assisting with new

14    hires; processing new hire paperwork; processing immigration paperwork, including I-9's;

15    coordinating drug testing; Lotto reconciliation; and more.

16    10. As an Office Manager, I generally do not share Operations Manager duties.  For example,

17    I review and retrieve Z-readings and credit card audits; enter Z-reading information into

18    spreadsheets; have responsibility for completing and verifying accuracy of sales reports;

19    compile and report daily sales figures for the Regional Vice President, Terry Lent, the

20    Hudson corporate office, Doug Martino, and the General Manager, Cathy Fisher; prepare

21    daily reports to distribute to Hudson partners; have responsibility for Dunbar orders;

22    handle accounts payable and accounts receivable matters; utilize accounting skills daily;

23    prepare deposit logs for corporate; prepare cashier over and shortage reports; prepare

24    weekly reports for corporate; handle general office work, including phone calls, letters,

25    faxes and filing; data entry; payroll processing; manage relationships and communications

26    with the landlord; and more.  These are duties that Operations Managers do not conduct at

27    all, especially on the selling floor.

28

-2-

DLA Piper LLP (US)
New York

EAST\89006362.1

DECLARATION OF DAISY BEGUM

1    I declare under penalty of perjury under the laws of the State of New York and the United States

2    of America that the foregoing is true and correct and that this declaration was executed this *29*

3    day of *December*, 201*4*, at New York, New York.

4

5

6    DAISY BEGUM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                                            -3-

DLA PIPER LLP (US)
NEW YORK

EAST\89006362.1

DECLARATION OF DAISY BEGUM



### Position:  Office Manager (Operations)

- Responsible for accurately counting daily deposits
- Reviews and retrieve Z-readings and credit card audits. Separating all reading by district and register number
- Entering Z-reading information into spreadsheets. Responsible for completing and verifying accuracy of sales report
- Report current day, last year and last week sale figures to Regional VP daily
- Prepares daily reports to distribute to Partners
- Responsible for Dunbar orders
- Accounts payable and accounts receivable duties as required
  Basic accounting skills
  Ten-Key by touch
- Verify that the safe has been counted and balanced at the beginning and end of day
- Preparing daily deposit log and communicating with corporate
- Responsible for counting and balancing cigarettes twice a day
- Pulling cigarette orders daily. Responsible for receiving cigarettes from Warehouse. Relay cigarette inventory needs to Warehouse every Wednesday and Sunday
- Preparing cashier over and shortage report
- Responsible for preparing weekly reports for corporate
- Responsible for all supply orders for Cash office
- Completion of daily counts for cigarettes, water, phone cards, watches and sunglasses/readers
- Responsible for daily perpetual
- General office work, including phone calls, letters, faxes and filing.
- Data Entry.
- Computer proficiency, including Word, Excel and Outlook.
- Payroll experience.
- Ensuring paperwork is done properly and accurately.
- Ordering of store supplies.
- Cash Register experience.
- Assist with register operation during peak times or when short staffed and giving breaks.
- Flexible to work periodic long and/or irregular hours including early mornings, weekends and holidays.
- Inventory control.
- Provide excellent customer service to our traveling public.
- Maintaining open and positive communication with the landlord or Airport Management.

### Knowledge, Skill and Ability:

- Knowledge in counting large volumes of cash
- Microsoft Excel experience required
- Ability to have a flexible work schedule
- Skill in organization and computer
- Basic accounting skills
- Excellent communication skills
- Able to work well under pressure, be Punctual, and a Flexible Team Player

# EXHIBIT 9

1  DLA PIPER LLP (US)
   1251 Avenue of the Americas
2  New York, New York  10020
   Tel.:   (212) 335-4500
3  Fax:   (212) 335-4501
   *Counsel for Defendants Hudson Group (HG) Retail, LLC*
4  *and Airport Management Services, LLC*

5  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
6  ------------------------------------------------------ X
   MOHAMMED NABI and RIFAT RIZVI,               :
7  *on behalf of themselves, FLSA Collective*       :
   *Plaintiffs and the Class,*                              :
8                                                                  :
                                     Plaintiffs,           :          Case No.  14 CIV 4635 (VEC)
9                                                                  :
                    -against-                              :                 ECF Case
10                                                                :
   HUDSON GROUP (HG) RETAIL, LLC,             :
11 AIRPORT MANAGEMENT                           :
   SERVICES, LLC and JOHN DOES 1-10,       :
12                                                                :
                                     Defendants.          :
13 ------------------------------------------------------ X

14              **DECLARATION OF KAMLESH DESAI**

15
16       I, Kamlesh Desai, declare as follows:

17  1.  I have personal knowledge of the facts set forth in this Declaration and, if called as a

18       witness, could and would testify competently as to their accuracy.

19  2.  I currently work as an Operations Manager at Hudson's Penn Station operations in New

20       York, New York.

21  3.  I have a graduate degree in Pharmacy from SP University in my native country of India.

22
23  4.  I was hired by Hudson in 1986 as a cashier at its Newark Airport operations.

24       Approximately one year later I was promoted to Operations Manager.  In 1995, I was

25       transferred to Baltimore, and in 2001 I was transferred to Penn Station where I have also

26       worked as an Operations Manager since.

27
28                                      -1-

5. As an Operations Manager, I receive a weekly salary which exceeds $455 per week, and I have not experienced any deductions in salary for partial-day absences.  My salary is not reduced for variations in the quality or quantity of my work.

6. Hudson's Penn Station operations consist of seventeen (17) locations.  Twelve (12) are located within Penn Station, two (2) are located at the Jacob Javits Center, two (2) are located at 33rd Street and one (1) is located at the World Trade Center.

7. Notices addressing employees' FLSA and overtime compensation rights are clearly and prominently posted on the main notice board, in front of the main entrance to the employee room.

8. As a Manager, I dress in business casual.  The hourly staff wear Hudson logo shirts.

9. I check into work using the Kronos system, which is an electronic thumbprint identification system.  I do not clock or stamp out of work when I leave the facility.

10. I supervise the AM daytime shift at Penn Station which begins at about 5:30 a.m. and ends at 4:00 p.m.  I punch in at the beginning of my shift using the Kronos Timekeeping system.  I do not punch out at the end of my shift.

11. During the AM shift, there are approximately 8-9 Managers supervising 60-70 hourly staff, including Sales Associates and Expeditors.

12. I tell the employees what to do and where to go.  Generally, the first thing I do after opening the stores is to direct employees to stock shelves and refrigerators, and arrange merchandise.

13. My management duties include canvassing the retail locations located within Penn Station and monitoring the Sales Associates working the floor.  I am also responsible for ensuring the stores are fully stocked with merchandise, that merchandise and promotional items are displayed properly, and that Hudson company policies are being followed.

-2-

14. As Operations Manager, part of my duties are to maximize sales based on customer preferences. In order to maximize sales and ensure profitability, I make sure that the stores are fully stocked and note which items move quickly, such as souvenir items (NYPD and I Love NY T-shirts), electronics (such as Sony headphones), candies and more. Based on my observations of customer preferences, I will suggest to the General Manager that certain items be carried in the stores. The General Manager will act on my recommendations.

15. To maximize sales, I also ensure that "pay and go" items (such as chips and snacks) are placed out front for customers in a rush.

16. I also help maximize sales by evaluating customers' needs. If customers ask for products that are not carried in our stores, I will make a recommendation to the General Manager that Hudson carry the product. For example, based on customer requests, I have recommended that chargers be carried in the stores, which the General Manager has approved.

17. I am also involved in promotional programs that begin the first of each month for certain merchandise such as magazines or candy. I am responsible and held accountable for the proper display of the promotional items.

18. I am involved in training new employees, which occurs on a daily basis. I instruct them on how to run the cash register, scan merchandise, and how to properly merchandize the store. I instruct employees to upsell merchandise by, for example, offering water to each customer during their purchase.

19. I am held accountable for the proper management and performance of my staff. I therefore regularly watch and train Sales Associates to ensure they are providing good customer service. For example, I train employees on how to deal with customers, give

-3-

proper greetings (hello or good morning), and to make small talk on topics such as the weather.  I also make sure associates are checking IDs for cigarette purchases, and only speak in English to each other in front of customers.  If associates fail to follow such company policies, I will reprimand them and may, if necessary, move or reschedule them to work in other Penn Station locations.  I will also conduct spot checks of Sales Associates' cash registers.

20. I generally cover multiple retail locations, except during the morning rush hour (which occurs between 7:00 a.m. and 9:00 a.m.) when I cover one specific retail location that is very busy.  When I walk around to each store, I check on the cashiers, merchandise, expirations, inventory, and note fast selling items.  At all times, I am supervising the Sales Associates and checking on the quality of customer service.  After rush hour ends, I will give Sales Associates feedback regarding their customer service.  If I pitch in to help my staff in an emergency, I do so independently, without being told by my General Manager, and not based on any schedule or time.

21. I create all AM employee schedules, and will assign employees to each store.  If a Sales Associate calls out sick, I exercise discretion in rearranging coverage throughout the stores.

22. I am also responsible for making sure Hudson policies are being followed and am held accountable if they are not.  For instance, Sales Associates are prohibited from speaking to each other in foreign languages while working in the store.  If a Sales Associate repeatedly fails to follow this rule under my watch, I will be held accountable.  In addition to repeatedly telling them not to do it, I will independently reschedule or move the employee to another store if I think it will solve the problem.  I am also accountable and responsible for minimizing shrink, and keeping an eye out for internal and external theft.

-4-

23. I also enforce the company dress code, by making sure my Sales Associates are clean shaven, wearing the proper uniforms, and are displaying their badges at all times.  If they come to work improperly dressed or without a badge, I will send them home.  Depending on the time of day (i.e. if my General Manager is not on duty) or the severity of the situation, I will send the employee home without consulting with the General Manager.  I also discuss problem employees with the General Manager.

24. I have the authority to discipline employees, and regularly do so.  For example, last week an employee was repeatedly tardy.  I had already spoken to my General Manager about this employee, and immediately sent him home without pay.  Last month, another cashier named Binish no-showed, leaving the operations short-staffed.  When Binish finally showed up at work, I sent him home without pay.

25. As an Operations Manager, I have keys to all 12 retail locations located within Penn Station, as well as the Javits Center, the administrative office, and the money room.  Additionally, I have keys to the stockroom and the soda room.  Managers working the night shift also have keys to the magazine and candy rooms.

26. I also attend management meetings with the General Manager.  These meetings are informal and conducted on an as needed basis.  For example, meetings have been called to inform managers about issues with counterfeit money being received at the stores, or to let the managers know that a consumer affairs or cigarette inspector will be dropping in.

27. I am only sometimes directly supervised by my General Manger.  I provide regular input and have the authority to make recommendations to him regarding the hiring, discipline (up to and including termination), advancement, and promotion of the hourly staff.

28. My duties and responsibilities are generally the same as those listed on the Hudson job description for Operations Managers.

-5-

1   I declare under penalty of perjury under the laws of the State of New York and the United States

2   of America that the foregoing is true and correct and that this declaration was executed this ____

3   day of  Jan . 8   , 2015 at New York, New York.

4

5

6

7                                       KAMLESH DESAI

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-6-